974 F.2d 1333
 1992-2 Trade Cases P 69,959
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
MARYLAND AND VIRGINIA MILK PRODUCERS COOPERATIVE
ASSOCIATION, INC., d/b/a Marva Maid Dairy,
Defendant-Appellant.
 No. 91-5182.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 3, 1992
Decided: Sept. 15, 1992
As Amended Oct. 27, 1992.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. John A. MacKenzie, Senior District Judge. (CR-91-120-N)
 Edward Lawrence Merrigan, Sr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Washington, D.C., for Appellant.
 Andrea Limmer, United States Department of Justice, Washington, D.C., for Appellee.
 William O. Bittman, Alexander P. Starr, Reed, Smith, Shaw & McClay, Washington, D.C., for Appellant.
 James F. Rill, Assistant Attorney General, Charles A. James, Deputy Assistant Attorney General, John J. Powers, III, Terrence F. McDonald, Marc W. F. Galonsky, Kerry J. Clarke, Philip J. Buri, United States Department of Justice, Washington, D.C., for Appellee.
 E.D.Va.
 AFFIRMED.
 Before WIDENER and HAMILTON, Circuit Judges, and STAMP, United States District Judge for the Northern District of West Virginia, sitting by designation.
 HAMILTON, Circuit Judge:
 
 OPINION
 
 1
 Defendant-appellant, Maryland and Virginia Milk Producers Cooperative Association, Inc.,[1] was convicted by a jury of one count of violating the Sherman Act, 15 U.S.C. § 1, and two counts of mail fraud, 18 U.S.C. § 1341. Appellant raises numerous issues on appeal, asserting error by the district court in:
 
 
 2
 (1)denying its motion to dismiss the indictment because of pre indictment delay;
 
 
 3
 (2)denying its request for the government to produce interview notes taken while debriefing Charles Elliott;
 
 
 4
 (3)finding sufficient evidence that the conspiracy continued into the limitations period;
 
 
 5
 (4)finding sufficient evidence that the Cooperative had the requi site intent to violate the Sherman Act;
 
 
 6
 (5)finding sufficient evidence that it committed mail fraud; and
 
 
 7
 (6)abusing its discretion in imposing sentence.
 
 
 8
 Finding no merit to these claims of error, we affirm.
 
 
 9
 * Organized in 1920, the Cooperative is a nonprofit, non-stock membership agricultural corporation, owned and operated by approximately 1,400 dairy farmers who produce milk in Delaware, Maryland, Pennsylvania, Virginia and West Virginia. The management of the Cooperative consists of a board of directors, all of whom are dairy farmers elected to represent various membership districts in the fivestate area. The net earnings of the Cooperative are distributed to its members, who then pay federal and state taxes on that income.
 
 
 10
 The principal mission of the Cooperative is to sell raw milk produced by its member-farmers. The Cooperative accomplishes this through a marketing division. The Cooperative also has a manufacturing division, where excess raw milk is manufactured into powdered milk and butter; an equipment division, which buys equipment at favorable prices; a Southside division, which is a group of farmers in Southside, Virginia; and the Marva Maid division, known as Marva Maid Dairy.
 
 
 11
 Marva Maid Dairy was built in 1962 in Newport News, Virginia. Marva Maid processes a portion of the member-farmers' raw milk into processed milk, butter, cream and similar dairy products and competes for commercial, military and school sales in the Tidewater and Colonial Heights-Petersburg markets of Virginia.
 
 
 12
 Public schools in the Commonwealth of Virginia purchase half-pint cartons of milk for school lunches on the basis of competitive bids. In the spring, schools send invitations to bid to various dairies in the area. The contracts usually cover whole milk, low-fat milk and chocolate milk, and they also include other dairy products, such as ice cream or cottage cheese.[2] Not all dairies respond to the bid solicitation. Bids must be submitted in sealed envelopes by a specified date and time. The bids are publicly opened and announced, and the contract is awarded to the lowest bidder. The schools receive state and federal funds to subsidize the purchase of milk products. State and federal regulations require competitive bidding for these products, in order to obtain the lowest price for the products involved. Most school districts in Virginia require signed bids to contain an express affirmation that the bid is not the result of collusion or agreement with any other bidder. This is "to enhance and encourage competition," Joint Appendix (J.A.) at 490, because competition"guarantees the lowest price and the best service." Id. Contracts are awarded in the spring or summer for the following school year. Contracts usually run for a period of twelve months beginning in the late summer.
 
 
 13
 The government's conspiracy theory alleged that Marva Maid conspired with several other milk companies, namely Pet Dairy, Inc. (a division of Pet, Inc. until 1985 and then a division of Land-O-Sun, Inc.), to rig the bidding process for the procurement of milk by school districts. The conspiracy focused on three key players, Charles Elliott, Lawrence Altaffer and Douglas Stamper. In September 1983, Elliott was hired by Marva Maid to replace Thomas Neale, Jr. as the division manager of Marva Maid, and after a training period where Neale advised Elliott on Marva Maid's operations, Elliott assumed this position on April 1, 1984. Neale remained with Marva Maid as an advisor. Prior to joining Marva Maid in 1983, Elliott was employed by the Virginia region of one of Marva Maid's competitors, Pet Dairy. From 1983 until his retirement on October 1, 1985, Altaffer was general manager of the Virginia region of Pet Dairy. When Altaffer retired, Stamper replaced Altaffer as general manager of Pet Dairy's Virginia region.
 
 
 14
 Pet Dairy competed with Marva Maid in parts of Virginia for school lunch contracts. Altaffer and Stamper were responsible for calculating and bidding on school milk contracts for Pet Dairy. As for Marva Maid, the bidding responsibilities fell upon Neale for about a year after Elliott was hired and then upon Elliott himself.
 
 
 15
 Initially, Pet Dairy was very concerned about Elliott's presence at Marva Maid because Elliott knew too much about Pet Dairy's operation. Pet Dairy also feared that Elliott would be aggressive at the reins of Marva Maid and would seek to capture some of Pet Dairy's customers. In an effort to avoid this, Altaffer asked Stamper to arrange a meeting between Elliott and Stamper to get a sense of Elliott's intentions. Stamper, Altaffer and Elliott testified they participated in meetings and conversations in which they agreed on behalf of Pet Dairy and Marva Maid to rig the bids for school milk contracts for the school years 1984-85, 1985-86 and 1986-87.
 
 
 16
 Stamper and Elliott met in the spring of 1984 to discuss, among other things, school milk accounts. Elliott said that he wanted more school accounts than were currently held by Marva Maid. Afraid that Elliott would aggressively go after many of Pet Dairy's existing school contracts, Pet Dairy agreed to let Marva Maid be the low bidder for the upcoming year on the Williamsburg contract, a contract that Pet Dairy had held in the preceding school years.[3] Pet Dairy and Marva Maid agreed further that each company would retain all other school district contracts that they presently held. To effectuate this allocation, Pet Dairy agreed to bid higher on the upcoming bid for Williamsburg than it had the previous year, and they discussed specific minimum prices to bid.[4] Stamper and Elliott departed the meeting having agreed that Pet Dairy would bid high on certain contracts allocated to Marva Maid, and that Marva Maid would bid high on certain contracts allocated to Pet Dairy. It was understood by the parties that the agreement would continue beyond 1984, subject to reconfirmation each year.[5] As a result of this agreement, Marva Maid was eventually awarded the Williamsburg school contract and both Pet Dairy and Marva Maid retained the accounts they had previously held in 1983.
 
 
 17
 Stamper and Elliott met again in the spring of 1985 and discussed rising milk prices, raw milk cost increases, the need for escalator clauses and their relative shares of school milk contracts in the marketplace. They reviewed the contracts for the previous year, and neither expressed any dissatisfaction with the current agreement and agreed to continue to maintain their same relative shares in the marketplace for the 1985-86 school year. Stamper and Elliott agreed that Pet Dairy would keep its schools for the upcoming 1985-86 school year, and that Pet Dairy "would not be a problem on the schools that Marva Maid had," permitting Marva Maid to retain those contracts. As they did in 1984, they exchanged the numbers that they would use to bid for the forthcoming year. Pet Dairy and Marva Maid bid in accordance with their agreement and each won its assigned contracts. Elliott left the meeting feeling the agreement would continue beyond the 1985-86 school year, subject to reconfirmation.
 
 
 18
 Stamper testified that he again met with Elliott in the spring of 1986 and discussed the bids on whole milk, low fat chocolate milk and low fat milk, and that he agreed with Elliott to continue the same allocation from the previous year. By this time, Altaffer had retired and Stamper had taken over as region manager for Pet Dairy. Stamper also testified that he discussed the bids he and Elliott would submit, once again to deflect any signs of collusion. Elliott testified that he did not recall a meeting in 1986, but was certain there was a conversation between Neale or himself and Stamper solidifying the continuation of the agreement. Thereafter, Marva Maid and Pet Dairy were again awarded the contracts they had previously held in 1985-86 school year.[6]
 
 
 19
 To summarize, both Marva Maid and Pet Dairy were paid for and performed the contracts they were awarded for the 1984-85, 1985-86, 1986-87 school years. The payments included two checks that were mailed by the City of Newport News, Virginia to Marva Maid for the performance of the 1985-86 (mailed in September 1986) and 1986-87 (mailed in March 1987) school lunch contracts.
 
 
 20
 In 1986, the Antitrust Division of the Justice Department conducted an investigation (1986 Investigation) of dairies that operated in the Richmond area. The 1986 Investigation focused primarily on alleged bid rigging on military milk contracts because the Defense Personnel Support Center was suspicious as to why it appeared that certain dairies received the same contracts each year. In July 1986, a federal grand jury subpoenaed records from the Cooperative that included all records pertaining to Marva Maid's bids, including bid files, workups, estimates, determinations of price and the submission of any bid for the sale of dairy products to the military, schools or any other customer in excess of $25,000, for the period of January 1, 1980 through July 1986. The Cooperative complied with the subpoena. Neale along with another official from a competing dairy testified before the grand jury and denied any bid rigging on milk contracts. The government also interviewed Elliott on four occasions in April 1987, and he denied any bid rigging on milk contracts. The government took notes during these interviews.
 
 
 21
 In 1988, because the government had insufficient evidence to indict any of the target dairies, the government closed the investigation and returned the subpoenaed documents to the Cooperative. After closing the 1986 Investigation, the Department of Justice (DOJ) began investigating bid rigging on milk contracts in the State of Florida. During the course of this investigation, the DOJ discovered that bid rigging on school milk contracts might have occurred in the RichmondNorfolk area of Virginia. In April 1990, a special grand jury began an investigation specifically focusing on bid rigging on school milk contracts. The primary targets of this investigation were Marva Maid, Pet Dairy and a number of other local dairies.
 
 
 22
 In May 1990, the Cooperative was served with another subpoena. This subpoena demanded the production of bid documents and related supporting evidence for the period January 1, 1984 through May 1990. On June 12, 1990, the Cooperative responded to the subpoena by producing documents, but some of Marva Maid's bid documents relating to the school years 1982-83, 1983-84, 1984-85, 1985-86 and 1986-87 (approximately twenty-five percent of what was previously produced) were not produced because they had been discarded by the Cooperative after the government closed the 1986 Investigation. The Cooperative had bid documents relating to the years in which the conspiracy ran its course (1984-87) and the particulars of the bids were also available from the school districts to which they were submitted. The government responded to the Cooperative via letter stating the Cooperative's response to the 1990 subpoena appeared incomplete.
 
 
 23
 In April 1991, the government served the Cooperative a third subpoena demanding the production of all missing bid documents, bid worksheets, correspondence, vouchers and other internal documents related to Marva Maid's bids for the 1984-85, 1985-86 and 1986-87 school years for the Colonial Heights, Dinwiddie, Hopewell, Newport News, Norfolk, Petersburg, Prince George, Sussex, Williamsburg/ James City and York County, Virginia, school systems. On June 10, 1991, the Cooperative informed the government that it produced all of the documents still in its files in response to the second subpoena served in 1990.
 
 
 24
 Between January and September 1991, the government interviewed Elliott on various occasions. The total time the government spent interviewing Elliott was approximately eighty to ninety hours. The government took notes during these interviews and also granted Elliott immunity. In May 1991, Stamper pleaded guilty to rigging school milk contracts, and the special grand jury returned an indictment against the Cooperative on July 30, 1991. Of particular note, Pet Dairy was not a target of the 1986 Investigation and was not requested to produce documents with respect to that investigation.
 
 
 25
 The four-count indictment charged the Cooperative with a violation of the Sherman Act, 15 U.S.C. § 1, two counts of mail fraud, 18 U.S.C. § 1341 and one count of filing false, fictitious and fraudulent statements, 18 U.S.C. § 1001, all arising out of the alleged conspiracy to rig bids on school milk contracts. Immediately after the indictment was filed, the Cooperative moved for a bill of particulars. That motion was opposed by the government and denied by the district court. The Cooperative also moved for the production of all Brady material, and the government responded in a letter that reads in part: "During an interview with Department of Justice attorneys, an agent from Naval Investigative Service and [sic] agent from the Defense Criminal Investigative Service on April 2, 1987 at the office of the U.S. Attorney in Norfolk, Virginia, Charles Elliott stated that he had no basis to believe there had been collusion on school bids...." J.A. at 35.
 
 
 26
 In response to this letter, the Cooperative filed a motion to compel production of all statements made by Elliott. At the hearing, the government opposed the motion, arguing it only possessed attorney work notes and that it had not made a determination as to whether Elliott would be called as a witness. The government also advised the district court that it had no verbatim statements of Elliott. The district court refused to order production of the notes and mistakenly directed the Cooperative to take Elliott's deposition. The Cooperative then served a subpoena on Elliott, and the government moved to quash. The district court quashed the subpoena, ruling that Elliott could be interviewed but not deposed. Elliott refused to be interviewed.
 
 
 27
 At trial, the government called three witnesses to testify, Elliott, Stamper and Altaffer. During Elliott's testimony, it was disclosed that Elliott had been granted immunity four times and prosecutors interviewed Elliott concerning his activities in the conspiracy between eighty and ninety hours during 1991. At that time, the Cooperative again moved for production of the government's notes made during the Elliott interviews. The Cooperative argued that the notes would shed light on why Elliott's account of bid rigging and collusion had changed between 1987 and 1991. The government argued to the district court that it complied with the Jencks Act and Brady inasmuch as it provided the contents of Elliott's 1987 statement and offered to produce the notes to the court for an in camera inspection. The district court denied the motion and declined to examine the notes in camera at that time.
 
 
 28
 At the conclusion of all evidence, the district court granted the Cooperative's motion for judgment of acquittal on the false statement count. The jury returned verdicts of guilty on the Sherman Act count and the two mail fraud counts. The Cooperative filed a motion for a new trial. At that time, the district court conducted an in camera review of the notes and ruled that they need not have been produced because there was no "basis in law or fact" to support the Cooperative's allegations. The district court did not explicitly cite to Brady or the Jencks Act.
 
 
 29
 The district court sentenced the Cooperative to a fine of $1,000,000 on the Sherman Act count and $50,000 on each of the mail fraud counts. The Cooperative appeals.
 
 II
 
 30
 Marva Maid initially argues that the preindictment delay denied it due process. We do not agree. It is well settled that one of the guarantees of the Fifth Amendment is that a defendant will not be subjected to excessive preindictment delay. In United States v. Automated Medical Laboratories, Inc., we adopted a "two pronged inquiry when preindictment delay is alleged to violate due process." 770 F.2d 399, 403 (4th Cir. 1985). It is the defendant's burden to demonstrate: first, that he has suffered actual prejudice and second, that the delay, balanced against the reasons for the delay proffered by the government, offends "fundamental conceptions of justice" or "the community's sense of fair play and decency." 770 F.2d at 404 (quoting United States v. Lovasco, 431 U.S. 783, 790 (1977)); United States v. Marion, 404 U.S. 307 (1971).
 
 
 31
 "The defendant has a heavy burden to prove that a preindictment delay caused actual prejudice: the proof must be definite and not speculative, and the defendant must demonstrate how the loss of a witness and/or evidence is prejudicial to his case." United States v. Moran, 759 F.2d 777, 782 (9th Cir. 1985), cert. denied, 474 U.S. 1102 (1986) (citations omitted).
 
 
 32
 In Marion, the Court did not specifically address what circumstances constituted actual prejudice requiring dismissal of the indictment, noting that such a determination was to be made on a case-bycase basis. 404 U.S. at 324-26. The Court also noted: "[a]ctual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution." Id. at 324-25.
 
 
 33
 Marva Maid argues that it was prejudiced because: (1) it was unable to interview Elliott because he was fired in December 1986 and refused to be interviewed and (2) it innocently discarded some of its bid documents after the documents were returned to Marva Maid at the close of the government's 1986 Investigation. We find the prejudice here is slight and does not rise to constitutional dimension. The record demonstrates that Marva Maid had every opportunity to question Elliott at length at trial and develop its theory of defense. In addition, the prejudice arising from the loss of the bid documents was minute. First, Marva Maid, other than its bald assertion that it lost key and essential documents, has not identified any specific documents that prejudiced its case or prevented it from piecing together the bid workups from the years at issue, or the years that preceded the conspiracy. Second, Marva Maid had every opportunity to question Elliott and Neale (a defense witness), who were responsible for the preparation of the bids in question. Finally, the bid documents in question were available from school districts to which the bids were submitted.
 
 
 34
 Weighing this meager prejudice against the reasons for the delay proffered by the government does not offend our sense of "fundamental conceptions of justice" or "the community's sense of fair play and decency." Lovasco, 431 U.S. at 790. First, the nature of an antitrust investigation cannot be overlooked. Often such an investigation, especially one involving a conspiracy such as this, will take many years to conduct and conclude. Mindful of this, the proper guide here is to ensure that the indictment is in place within the statute of limitations period. See United States v. Ewell, 383 U.S. 116, 122 (1966) ("the applicable statute of limitations ... is ... the primary guarantee against bringing overly stale charges"). As discussed in Part IV A, infra, the indictment fell within the applicable limitations period. Second, and most importantly, during the 1986 Investigation, the government was hampered due to Elliott's and other dairy officials' denial of knowledge of any bid rigging. Finally, the 1986 Investigation did not involve Pet Dairy. Rather, it focused primarily on military milk projects, and the 1990 Investigation concerning school bid rigging arose only after an investigation in Florida led prosecutors to believe that there was, in fact, bid rigging on school milk contracts in Virginia.
 
 
 35
 In the case sub judice, the reasons for the government's failure to indict at the conclusion of its 1986 Investigation are pointedly akin to insufficient evidence rather than an attempt "to gain a tactical advantage over the accused." Marion, 404 U.S. at 324. Posited as such, we are guided here by Lovasco in so far as"prosecutors do not deviate from 'fundamental conceptions of justice' when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause." 431 U.S. at 790-91. Because Elliott's 180-degree turn provided the primary catalyst in the return of the later indictment, and the government did not delay in pursuing the indictment thereafter, see Lovasco, 431 U.S. at 795 n.17 (possibility of due process violation upon showing prosecutorial delay incurred in reckless disregard of the circumstances), we perceive no error. It is also worthy of note that other circuits find no due process violation in the absence of prejudice and evidence that the government intentionally delayed to seek a tactical advantage. See, e.g., United States v. Sims, 779 F.2d 16, 17 (8th Cir. 1985) (defendant must show that the "government intentionally delayed seeking an indictment to gain tactical advantage and that the delay substantially prejudiced his defense"); United States v. Benson, 846 F.2d 1338 (11th Cir. 1988) (same). Essentially, Marva Maid would have us dismiss this indictment when the government: (1) sought no tactical advantage: (2) reopened its investigation only after it came across newly discovered evidence, namely, the testimony of Elliott; and (3) diligently investigated and prosecuted the case thereafter. This we cannot intimate. Here the record is totally devoid of any attempt to gain a tactical advantage or neglect or recklessness in attempting to prosecute. We hold, therefore, that there was no denial of Marva Maid's due process rights.
 
 III
 
 36
 Marva Maid makes its most salient argument under Brady and the Jencks Act with respect to the government's failure to turn over the "Elliott interview notes."[7] We shall address each of these arguments in turn.
 
 
 37
 * Marva Maid claims that the government violated the dictates of Brady v. Maryland, 373 U.S. 83 (1963), because the government failed to produce the Elliott interview notes. As a result, Marva Maid argues to this court that a new trial is warranted. The Brady rule is grounded in due process. "Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." United States v. Bagley, 473 U.S. 667, 675 (1985) (footnotes omitted).
 
 
 38
 "Suppression of exculpatory evidence by the government that is material to the outcome of the trial violates due process." United States v. Curtis, 931 F.2d 1011, 1014 (4th Cir.), cert. denied, 112 S. Ct. 230 (1991). Under Brady, upon defendant's request, the government must disclose material evidence favorable to the defense. Evidence is material when " 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " Curtis, 931 F.2d at 1014 (citing Bagley, 473 U.S. at 682). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Wilson, 901 F.2d 378, 380 (4th Cir. 1990) (citations omitted). Brady also requires the disclosure of impeachment evidence that is material. Bagley, 473 U.S. at 676. Material impeachment evidence is that which "if disclosed and used effectively, it would make the difference between conviction and acquittal." Id.; see also, Giglio v. United States, 405 U.S. 150, 154 (1972) (nondisclosure of impeachment evidence falls under Brady when reliability of witness may well be determinative of guilt or innocence).
 
 
 39
 In the present case, Marva Maid sought the production of the government's notes made during Elliott's extensive interviews in 1991. Under such circumstances, it is within the discretion of the district court to accord proper discovery. In certain instances, an in camera inspection may be required and, perhaps, an eviden tiary hearing. As to the proper course to select, district courts should be given broad discretion and simply guided by fundamental fairness which is the cornerstone of Brady.
 
 
 40
 Marva Maid claims that, in light of the vicarious nature of the pending charges, it was "crucially important ... for the government to disclose exculpatory, impeachment or credibility evidence contained in the notes...." Reply Br. at 9 (emphasis in original). The government argues that it complied with Brady inasmuch as it produced the contents of Elliott's 1987 statement in which he indicated he had no basis to conclude there had been collusion on school bids, an obvious inconsistent statement in light of his testimony at trial. We believe that the government complied with the dictates of Brady.
 
 
 41
 Without citing Brady, the district court examined the notes after the trial and held that they did not have to be produced because there was no "basis in law or fact" to warrant disclosure. Our own in camera review of the notes leads us to the same inescapable conclusion; there is nothing to suggest that the result would have been different had the notes been produced. The only impeachment or exculpatory evidence in the notes is the reference to Elliott's 1987 inconsistent statement. Marva Maid at trial cross-examined Elliott extensively on this inconsistent statement. Marva Maid also questioned Elliott regarding his alleged bid rigging activities and his decision to cooperate with the government. In these regards, the documents would have been only duplicative and cumulative.
 
 
 42
 Marva Maid's argument misses the mark. Marva Maid would have us focus our inquiry on the impact of the undisclosed evidence on its ability to prepare for trial as opposed to the materiality of the evidence to the issue of guilt or innocence. Undoubtedly, this is due to the vicarious nature of the case and the fact that it had not seen the notes in question. However, these facts do not enter the calculus. An argument identical to that raised by Marva Maid was rejected in United States v. Agurs, 427 U.S. 97 (1976). There, the Court observed in rejecting the notion that the Brady inquiry should focus on the defendant's ability to prepare for trial:
 
 
 43
 [s]uch a standard would be unacceptable for determining the materiality of what has been generally recognized as "Brady material" for two reasons. First, that standard would necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecutor's entire case would always be useful in planning the defense. Second, such an approach would primarily involve an analysis of the adequacy of the notice given to the defendant by the State, and it has always been the Court's view that the notice component of due process refers to the charge rather than the evidentiary support for the charge.
 
 
 44
 427 U.S. at 112 n.20.
 
 
 45
 Consequently, going into trial, Marva Maid had all the impeachment evidence from the notes required under Brady, but the jury chose to believe the government's theory that Elliott lied in 1987 when he represented that he had no basis to believe there had been collusion on school milk bids. This is neither a case in which the key government witnesses had a personal stake in the outcome of the litigation which was not disclosed, see Giglio, 405 U.S. at 154-55 (government withheld information that it had promised a coconspirator that he would not be prosecuted if he testified); Bagley, 473 U.S. at 683 (government failed to disclose that it had contract with witnesses to supply information), nor one where the government withheld evidence "so clearly supportive of a claim of innocence that it [gave] the prosecution notice of a duty to produce." Agurs, 427 U.S. at 107. This is a case where the government met its obligation under Brady by providing all of the exculpatory and impeachment evidence it possessed. In sum, we conclude there is not a "reasonable probability that, had the [Elliott interview notes] been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.
 
 B
 
 46
 Marva Maid also argues that the government failed to comply with the Jencks Act, 18 U.S.C. § 3500, by failing to produce the Elliott interview notes after Elliott testified at trial.
 
 
 47
 The Jencks Act provides that after a witness for the United States has testified on direct examination, the United States must produce "any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). A "statement" is defined as: (1) a written statement made by the witness and signed or otherwise adopted or approved by him; (2) a substantially verbatim transcription and contemporaneous recording of the oral statement of the witness; or (3) a statement made by the witness to a grand jury. 18 U.S.C. § 3500(e). If the statement sought to be produced qualifies as a "statement" under the Act, but the government claims that it does not relate to the subject matter of the testimony of the witness, then the court must order the statement to be produced for in camera inspection to determine the relevance of the statement. 18 U.S.C. § 3500(c).
 
 
 48
 In Goldberg v. United States, the Supreme Court noted:
 
 
 49
 Every witness interview will, of course, involve conversation between the lawyer and the witness, and the lawyer will necessarily inquire of the witness to be certain that he has correctly understood what the witness has said. Such discussions of the general substance of what the witness has said do not constitute adoption or approval of the lawyer's notes within § 3500(e)(1), which is satisfied only when the witness has "signed or otherwise adopted or approved" what the lawyer has written. This requirement is clearly not met when the lawyer does not read back, or the witness does not read, what the lawyer has written. 425 U.S. 94, 110 n.19 (1976). In his concurrence in Goldberg, Justice Powell noted:
 
 
 50
 The proper administration of the Act requires that the defendant meet an initial burden of showing that collateral inquiry is necessary to protect his rights under the Act.... This requirement is also appropriate because the trial should not be interrupted for collateral proceedings absent a genuine need for them....
 
 
 51
 The burden on the moving defendant is not to prove the existence of a statutory "statement." The purpose of the collateral proceedings is to resolve that issue. Rather, the burden is simply to establish by probative evidence-usually in cross-examination of the witness alleged to have given a statement-that there is reason to believe that a statutory "statement" may exist. Certainly more must be shown than a speculative possibility. If, as here, the defendant's theory is that a prosecutor's notes meet the requirement of subsection (e)(1), the questions must be asked the witness that focus on whether there was in fact an "adoption or approval" of a specific statement, rather than general concurrences in the correctness of the prosecutor's understanding of what the witness knows. Absent explicit answers to such questions that satisfy the defendant's burden, the trial judge should deny the motion for production without the collateral proceeding.
 
 
 52
 425 U.S. at 123.
 
 
 53
 It is well settled that prosecutors are not required to take notes that qualify as Jencks Act statements when they interview witnesses. United States v. Martino, 648 F.2d 367, 387 (5th Cir. 1981), cert. denied, 456 U.S. 943 (1982). Here, the government admitted prior to trial that it had "attorney work notes" of Elliott's interviews, but stated that the notes were not Jencks Act "statements." Furthermore, when Elliott testified at trial, Marva Maid cross-examined him extensively about his meetings with government prosecutors. Defense counsel specifically asked Elliott whether the government and Elliott's attorneys took notes at these meetings (which Elliott answered affirmatively), and whether the government"ever show[ed] you any statements that you had given, or notes or what have you during any of these 80 or 90 hours that he had spent interviewing you?" Elliott responded, "No, sir. They just asked me questions and questions and questions." J.A. at 377. The district court heard the vehement arguments of the defense as to why the notes should be disclosed under the Jencks Act, but declined to order production. The district court was aware of Elliott's testimony at that time and the government's proffer that the notes did not contain Jencks Act statements and ruled in accordance with those affirmations.
 
 
 54
 Interview notes are not Jencks Act statements unless the witness signed or otherwise adopted or approved the notes, or the notes were substantially verbatim notes of the witness interview. United States v. Welch, 810 F.2d 485, 490 (5th Cir.), cert. denied, 484 U.S. 955 (1987). Here, to qualify as a Jencks Act statement, Elliott "must have signed, read, or heard the entire statement read." United States v. Pierce, 893 F.2d 669 (5th Cir. 1990) (citing United States v. Hogan, 763 F.2d 697, 704 (5th Cir. 1985)); See also, United States v. Hinton, 719 F.2d 711, 715 (4th Cir. 1983), cert. denied, 465 U.S. 1032 (1984) (government notes of a witness' statements do not constitute a Jencks Act "statement" "unless it reflects the witness' own words fully and without distortion," and is coupled with "a'finding of unambiguous and specific approval' of specific notes").
 
 
 55
 On cross-examination, the defense tried (but to no avail) to develop a theory that Elliott had adopted or approved the notes. Marva Maid asked Elliott whether the government had ever showed him the notes, and Elliott replied in the negative. Marva Maid could have easily asked Elliott questions as to whether the government wrote down passages verbatim or read the notes back to him, but did not. This crossexamination of Elliott did not create an adequate foundation that would necessitate further inquiry as to whether Elliott adopted or approved the notes. Goldberg, 425 U.S. at 109; Pierce, 893 F.2d at 675. Similarly, there is no evidence in the record to demonstrate that the notes were a substantially verbatim transcription of Elliott's statements. Marva Maid was not entitled to view the interview notes because they do not constitute Jencks Act statements of Elliott.
 
 
 56
 Marva Maid argues that the district court should have conducted an in camera inspection of the notes. We disagree. First, we note an in camera inspection is not per se required. See United States v. Herrero, 893 F.2d 1512, 1524 (7th Cir.) ("Because the extrinsic evidence in this case concerning the preparation of the interviewers' notes so clearly established that they did not fall within the definition of Jencks Act statements, there was no need to conduct an in camera inspection ...."), cert. denied, 110 S. Ct. 2623 (1990); United States v. Allen, 798 F.2d 985, 995 (7th Cir. 1986) (in camera inspection is not statutorily mandated for a determination of whether document constitutes a Jencks Act statement). Second, under the circumstances, the district court acted within its discretion in refusing to conduct an in camera inspection or evidentiary hearing under Goldberg and its progeny. Pierce, 893 F.2d at 675 (in camera inspection required only "if a timely request is made by the defense and some indication exists in the record that the notes meet the Jencks Act definition of a statement") (emphasis in original) (citations omitted). As discussed, supra, there is nothing in the record to inferentially support a finding that the notes were Jencks Act statements.
 
 
 57
 Where a proper evidentiary foundation is laid, district courts should be keenly aware of the need, especially in vicarious liability cases such as the one before us, to make sufficient factual determinations as to whether interview notes are Jencks Act statements. We, however, are of the impression that the record is adequately developed before us to conclude that (1) Marva Maid did not create an evidentiary foundation that the notes were Jencks Act statements and (2) the notes were not Jencks Act "statements."
 
 
 58
 In light of this, a collateral proceeding would only unduly delay the proceedings. Under these pellucid circumstances, Marva Maid was not entitled to an in camera determination or an evidentiary hearing below as to whether the notes should have been produced. In addition, we feel that requiring an in camera inspection or an evidentiary hearing in this case would be akin to sanctioning a fishing expedition. The only conceivable mechanism that would illustrate adoption or approval would be to permit a hearing in which the defense would attempt to show that Elliott had adopted or approved the notes despite his very specific testimony to the contrary, the notes themselves, and the government's representation that Elliott had not adopted or approved the notes. This we decline to do. While there may be circumstances where a criminal defendant could go outside a witness' testimony denying approval, the notes themselves, and the government's proffer that the witness did not adopt or approve the notes, this is not such a case.
 
 
 59
 The district court heard the strong arguments of the defense as to why the notes should be disclosed under Brady and the Jencks Act before, during, and after the trial. The district court was aware of Elliott's testimony at trial and the government's proffer that the notes did not contain Brady material or Jencks Act statements when it ruled at trial and on the motion for new trial in accordance with those affirmations. Marva Maid has simply not presented a scintilla of evidence demonstrating that Elliott even tacitly adopted or approved the notes, and thus, no remand is required.[8]
 
 IV
 
 60
 Marva Maid raises numerous issues regarding its conviction under the Sherman Act, 15 U.S.C. § 1. We shall address each of these arguments in turn.
 
 
 61
 * Marva Maid argues that the government failed to prove that the alleged Sherman Act violation occurred within the applicable fiveyear statute of limitations period. The Sherman Act count alleged that the conspiracy to rig bids began in 1984 and continued until the summer of 1987. The basis of this theory, as proved at trial, was that a reconfirmation meeting or conversation took place in the spring of 1986 that rigged the bids for the school year 1986-87. The indictment was filed on July 30, 1991.
 
 
 62
 In United States v. Kissel, Justice Holmes, writing for the Court, observed that if a conspiracy contemplates a continuance in time, the "conspiracy continues up until the time of success or abandonment." 218 U.S. 601, 608 (1910). In Grunewald v. United States, the Supreme Court noted: "[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may properly be regarded as in furtherance of the conspiracy." 353 U.S. 391, 397 (1957). "Thus, as long as some action is necessary to achieve a conspiratorial objective, a conspiracy, under the Sherman Act or otherwise, continues until the offense has been abandoned or until the objective is accomplished." United States v. A-A-A Electric Co., Inc., 788 F.2d 242, 245 (4th Cir. 1986) (citations omitted). In light of this, "[T]he statute of limitations period begins to run, not from the date of the legally cognizable harm, but from the date of the last overt act." Id. (citations omitted).
 
 
 63
 In the case at bar, there is demonstrable evidence showing significant appreciable knowledge and participation in the conspiracy within the limitations period. The indictment was filed July 30, 1991, and charged Marva Maid with engaging in a conspiracy to rig bids from "[b]eginning at least as early as the spring of 1984 and continuing through the end of the 1986-1987 school year...." J.A. at 8. The government presented evidence that the conspiracy had its origins early in 1984 and that Elliott and Stamper agreed in 1986 to continue the bid rigging agreement for the 1986-87 school year. Marva Maid accepted money from these rigged bids from various school districts in 1986 and 1987, including checks in September 1986 for the 198586 rigged bids and in March 1987 for the 1986-87 rigged bids on the City of Newport News school contracts.
 
 
 64
 As Grunewald mandates, it is the nature and scope of the conspiratorial agreement which defines the duration of the conspiracy. After determining the nature and scope of the conspiracy, we can assess whether the alleged overt act constitutes an act in furtherance of the conspiracy. Here the duration continued into the 1986-87 school year as evinced by the agreement between Pet Dairy (Stamper) and Marva Maid (Elliott). Part of the nature of the conspiracy was to supply milk during the 1986-87 school year at rigged prices. Each time milk was delivered at the rigged price, this constituted an act in furtherance of the conspiratorial agreement. In addition, each time a check was received on a rigged bid, this also constituted an act in furtherance of the conspiracy.[9] Without this continued compliance with the rigged contracts, the aims of the conspiracy would not be attained. The conspiracy contemplated a termination at the end of the school year in the summer of 1987, subject to reconfirmation. As a whole, the evidence amply supports a finding that the conspiracy continued into the limitations period.
 
 
 65
 Marva Maid makes much of Elliott's May 1986 demotion, arguing that it negates any possibility that the conspiracy continued into the limitations period. This argument ignores Stamper's and Elliott's testimony that there was some type of 1986 reconfirmation, albeit unclear as to whether a conversation or meeting solidified the agreement. In addition, despite Elliott's demotion, Elliott testified that Neale was aware of the conspiracy and condoned the bid rigging on the part of Marva Maid. It is certainly a reasonable inference that when Neale reassumed the division manager's position on July 1, 1986, he desired to maintain continued compliance with the agreement. Neale denies any knowledge, as Marva Maid points out, but the resolution of this issue remained properly before the jury.
 
 B
 
 66
 Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits contracts, conspiracies, and combinations in restraint of trade. United States v. Gravely, 840 F.2d 1156 (4th Cir. 1988). " 'Acceptance by competitors of an invitation to participate in a plan, the necessary consequence of which, if carried out, is a restraint of commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act, where each competitor knew that cooperation was essential to successful operation of the plan.' " United States v. Foley, 598 F.2d 1323, 1331 (4th Cir. 1979) (quoting 3 P. Areeda & D. Turner, Antitrust Law: An Analysis of Antitrust Principles and Their Application Paragraph 841a, at 36162 (1978)), cert. denied, 444 U.S. 1043 (1980).
 
 
 67
 "To establish a violation of § 1 of the Sherman Act the prosecution need only show that [Marva Maid] willfully joined the conspiracy with intent to further some purpose of it." Gravely, 840 F.2d at 1161 (citing Foley, 598 at 1335-36). "Bid rigging" is a per se violation of the Act. United States v. Portsmouth Paving Corp., 694 F.2d 312, 317 (4th Cir. 1982). The government is not required to establish that Elliott had a specific intent to accomplish a restraint on trade or violate the Sherman Act; rather it is sufficient for the government to establish that Elliott "acted with knowledge of the anticipated consequences of his action." Foley, 598 F.2d at 1335 (citing United States v. United States Gypsum Co., 438 U.S. 422, 446 (1978)). See also United States v. Smith Grading and Paving, Inc., 760 F.2d 527, 533 (4th Cir.) (government need not prove specific intent in per se Sherman Act cases), cert. denied, 474 U.S. 1005 (1985); United States v. Continental Group, Inc., 603 F.2d 444, 460-62 (3d Cir. 1979) (same), cert. denied, 444 U.S. 1032 (1980); United States v. Brighton Building and Maintenance Co., 598 F.2d 1101 (7th Cir.) (same), cert. denied, 444 U.S. 840 (1979).
 
 
 68
 Marva Maid argues that the government failed to prove that Elliott had the necessary intent to violate the Sherman Act. This argument lacks merit because the government clearly established a violation of the Sherman Act, through the actions of Elliott on behalf of Marva Maid. Stamper and Elliott met in the spring of 1984 to discuss, in part, school milk accounts. Elliott informed Stamper that he wanted more school accounts than were currently held by Marva Maid. Stamper agreed and let Marva Maid be the low bidder for the upcoming year on the Williamsburg contract, a contract that Pet Dairy had held in the preceding school years. Pet Dairy and Marva Maid agreed further that each company would retain all other school district contracts that they presently held. To effectuate this, Pet Dairy agreed to bid higher on the upcoming bid for Williamsburg than it had the previous year, and they discussed specific minimum prices to bid. They left the meeting having agreed that Pet Dairy would bid high on certain contracts allocated to Marva Maid and that Marva Maid would bid high on certain contracts allocated to Pet Dairy. It was understood by the parties that the agreement would continue beyond 1984, subject to reconfirmation each year. They further agreed on the approximate amount of their bids to deflect any signs of collusion or bid rigging. As a result of this agreement, Marva Maid was eventually awarded the Williamsburg school contract and both Pet Dairy and Marva Maid retained the accounts they had previously held in 1983. This agreement was reconfirmed in 1985 and 1986 for the 1985-86 and 1986-87 school years. This evidence makes it clear that Elliott formulated the necessary intent to violate the Sherman Act and Marva Maid's corporate intent was satisfied through Elliott's actions. See United States v. Basic Construction Co., 711 F.2d 570, 573 (4th Cir.) (corporation criminally responsible under the Sherman Act for antitrust violations committed by employee if employee acts within the scope of his authority, or apparent authority, and for the benefit of the corporation, even if against corporate policy), cert. denied, 464 U.S. 956 (1983).[10]
 
 
 69
 Marva Maid contends its economic data offered at trial negates any inference that Elliott intended to violate the Sherman Act. In Gravely, we rejected similar arguments. There Gravely made"much of a market study prepared by a defense expert and testified to at trial that tended to negate a conclusion that the market was acting under pricefixing." Id. We rejected this argument in Gravely as specious because: (1) horizontal price-fixing was a per se violation of the Sherman Act, (2) a Sherman Act violation is established despite the fact that the conspiracy was unsuccessful, and (3) the subsequent meetings of the coconspirators evinced an animus toward enforcing the agreement. Id. The same reasons for rejection of this argument in Gravely are prevalent here. First, bid rigging is a per se violation of the Sherman Act. Second, the fact that the conspiracy may have been unsuccessful is irrelevant. Third, the record supports that Pet Dairy and Marva Maid reconfirmed their bid rigging scheme in 1985 and 1986. Succinctly stated, the evidence as a whole supports a finding that the government proved that Elliott formulated the necessary intent to violate the Sherman Act and the evidence that a violation of the Sherman Act occurred was overwhelming.[11]
 
 V
 
 70
 On the basis of the checks mailed to Marva Maid by the City of Newport News in September 1986 and March 1987, the indictment charged Marva Maid with two counts of mail fraud, 18 U.S.C. § 1341, arising out of the alleged conspiracy to rig the bids on the Newport News school milk contracts. The City of Newport News school system was included in the bid rigging agreement between Pet Dairy and Marva Maid. In 1984 and 1986, there was no competition from other dairies such that the agreement between Marva Maid and Pet Dairy resulted in Marva Maid obtaining the contract without any competitive bidding. However, Elliott testified that, despite his agreement with Pet Dairy, he was forced to submit a more competitive bid in 1985 on the City of Newport News contract because other dairies competed for the contract in that year.
 
 
 71
 The mail fraud statute provides in pertinent part:"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do [uses the mails], shall be fined not more than $1000 or imprisoned not more than five years, or both." 18 U.S.C. § 1341. The offense of mail fraud is established by proving a scheme to defraud the schools of money or property and the use of mails in furtherance of the scheme. Pereira v. United States, 347 U.S. 1, 8 (1954); United States v. Locklear, 829 F.2d 1314, 1318 (4th Cir. 1987) (citation omitted). The phrase " 'any scheme to defraud' is to be construed broadly." United States v. Coyle, 943 F.2d 424, 426 (4th Cir. 1991).
 
 
 72
 The government is also required to demonstrate that the scheme to defraud intended to deprive a victim of money or property. McNally v. United States, 483 U.S. 350 (1987). The government need not prove that the victim was actually deprived of money or property, rather the government need only show that the defendant intended to deprive the victim of money or property. United States v. Ames Sintering Co., 927 F.2d 232, 235 (6th Cir. 1990); United States v. Oren, 893 F.2d 1057, 1061 (9th Cir. 1990); United States v. Utz, 886 F.2d 1148, 1151 (9th Cir. 1989), cert. denied, 110 S. Ct. 3242 (1990). Under this analysis, it is sufficient for the government to meet this burden by demonstrating that the defendant intended to cause economic harm. United States v. Martinez, 905 F.2d 709, 715-16 (3rd Cir.), cert. denied, 111 S. Ct. 591 (1990).
 
 
 73
 Marva Maid claims that its mail fraud convictions should be reversed because the subject bids submitted to the City of Newport News were competitive and, thus, the City of Newport News was not deprived of money or property.[12] Marva Maid relies on McNally. In McNally, the Court reversed a mail fraud conviction under § 1341, noting that § 1341 "protects property rights, but does not refer to intangible rights of the citizenry to good government." Id. at 356. Thus, under McNally, if Marva Maid did not intend to deprive the City of Newport News of any money or property, the conviction cannot stand. In 1988, 18 U.S.C. § 1346 was enacted to overrule McNally. Section 1346 provides that a " 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." However, McNally applies to this case because the mail fraud conduct occurred before the enactment of § 1346, which has no retroactive application. Accord United States v. Schwartz, 924 F.2d 410 (2d Cir. 1991); McEvoy Travel v. Bureau, Inc. v. Heritage Travel, Inc., 904 F.2d 786, 791 (1st Cir. 1990), cert. denied, 111 S. Ct. 536 (1991); United States v. Davis, 873 F.2d 900, 902 (6th Cir.), cert. denied, 110 S. Ct. 292 (1989).
 
 
 74
 The indictment charged that Marva Maid "devised and intended to devise a scheme and artifice to defraud the City of Newport News of money and property." J.A. 14. The jury instruction provided that in order to find the defendant guilty of mail fraud the jury must find that the defendant (1) knowingly participated in a conspiracy to deprive the City of Newport News of money or property, (2) acted with a specific intent to defraud, and (3) caused the mails to be used to further or carry out the scheme to defraud.
 
 
 75
 The government presented evidence that with each bid submitted to the City of Newport News there was an affidavit of non-collusion included. This affidavit stated in part that the bid submitted was not the result of collusion or fraud. Elliott testified that Marva Maid submitted bids knowing that the affidavit of non-collusion was false. Elliott also testified that absent the agreement with Pet Dairy the bids submitted to the school districts would have been lower. Thus, Marva Maid intentionally designed a bid rigging scheme to defraud the City of Newport News of money or property and submitted false statements to the City of Newport News in furtherance of this scheme to defraud.
 
 
 76
 Marva Maid contends that if Elliott's bids were competitive, it negates any intent to defraud. However, Elliott's testimony was that absent the agreement with Pet Dairy, the bids he submitted would have been lower. With this in mind, the other competition in 1985 only served to curb the sizable gain that Marva Maid would derive absent the competition. The government need not prove that the scheme to defraud was successful.[13] In a light most favorable to the government, Glasser v. United States, 315 U.S. 60, 80 (1942), the evidence was sufficient to sustain the mail fraud convictions. There was ample evidence that Marva Maid devised a scheme to defraud the City of Newport News of money or property and used the mails to further the scheme. Pereira, 347 U.S. at 8; Locklear, 829 F.2d at 1318 (citation omitted).[14]
 
 VI
 
 77
 The district court gave the following instruction tendered by Marva Maid:
 
 
 78
 You may consider the evidence relating to the cooperative's cost, prices, profits, along with all the other evidence you have seen or heard in the trial, in determining whether or not a conspiracy existed. And if so, whether or not the cooperative was a knowing, willful member of that conspiracy.
 
 J.A. at 693. The court then stated:
 
 79
 [Y]ou may consider the evidence of price, cost and profits only as it relates to whether or not there was indeed an agreed conspiracy to submit rigged bids and whether the Defendant cooperative was a member thereof.
 
 
 80
 If you should ultimately determine from all the evidence in the case, including the profit income evidence, that it has been proved beyond a reasonable doubt that such conspiracy did in fact exist and that this Defendant was a member thereof and participated therein, then the economic evidence of price, cost and profits is to be disregarded by you. It is no defense to illegal bid rigging when found that the prices, cost or profits were reasonable, unreasonable, high, low, fair, or unfair.
 
 
 81
 J.A. at 694 (emphasis added). Now on appeal, Marva Maid claims that the district court erroneously instructed the jury on how it should treat Marva Maid's economic evidence. More specifically, Marva Maid argues that the district court's instruction did not allow the jury to consider the economic evidence in determining whether "Elliott ... actually concluded or performed the bid rigging agreement now charged against Marva Maid." Appellant's Reply Brief at 12. In short, Marva Maid argues the use of the word "disregarded" by the district court resulted in an instruction that their economic evidence should be totally disregarded.
 
 
 82
 The district court admitted all of appellant's economic evidence. However, the district court correctly limited the scope of the economic evidence with a cautionary instruction as to the Sherman Act count, because while the reasonableness of prices and profits may serve to negate the existence of any price-fixing conspiracy (agreement), if the jury finds that a price-fixing conspiracy existed, the fact that the prices fixed were "reasonable" is no defense. United States v. Portsmouth Paving Corp., 694 F.2d 312, 317 (4th Cir. 1982). As we view the instruction, it was not erroneous. The instruction allowed the jury to properly consider whether an agreement to rig bids between Elliott and Pet Dairy ever existed, which is the gravamen of the Sherman Act count, and thus, the instruction did not "undermine the fundamental fairness of the trial and [result in] a miscarriage of justice." Brasfield v. United States, 272 U.S. 448, 450 (1926); United States v. Polowichak, 783 F.2d 410, 416 (4th Cir. 1986).
 
 VII
 
 83
 Marva Maid argues the district court's imposition of a $1,000,000 fine on the Sherman Act count (count one) and a $50,000 fine on each of the mail fraud counts (counts two and three) was excessive, unreasonable and discriminatory. Whether a fine is excessive or unreasonable is reviewed under the abuse of discretion standard. United States v. Harvey, 885 F.2d 181, 183 (4th Cir. 1989). The factual findings of the district court are reviewed under the clearly erroneous standard.
 
 
 84
 Marva Maid was sentenced under the Criminal Fines Enforcement Act, 18 U.S.C. § 3622. In imposing sentence, the district court was required to apply the enumerated factors in § 3622 (now replaced by § 3572). Harvey, 885 F.2d at 182-83. The district court completed this task. More specifically, the district court in fashioning an appropriate sentence considered the nature of the activities, here bid rigging, Marva Maid's earnings, any burden a fine would inflict upon Marva Maid, the pecuniary loss inflicted on school districts, and the need to deprive Marva Maid of illegally obtained gains derived from its bid rigging.
 
 
 85
 Marva Maid essentially contests the district court's findings that "the pecuniary loss inflicted on the school districts ... [is] in the hundreds of thousands," and "[t]he court has considered the amount of the fines levied in this case and believes that they will sufficiently deprive the defendant of the illegally obtained gains of its conduct." J.A. 78182. In its purest sense, Marva Maid argues that the profits derived from its conduct were minimal and, therefore, the district court's findings are clearly erroneous. In response, the government points to Elliott's testimony that Marva Maid's prices would have been lower absent the bid rigging. The government also introduced evidence at sentencing that the price of raw milk decreased during the indictment period, while prices of processed milk (the completed product) rose. Raw milk is the most significant cost factor in the production of processed milk. In addition, the government demonstrated that the price of milk at school facilities was 20-48% higher than the prices submitted for state facilities. Moreover, the government produced evidence at sentencing as to overcharges of $205,181 at the Norfolk school district. Finally, the government introduced evidence that milk prices to the Williamsburg school district increased considerably after Marva Maid was awarded the contract.[15]
 
 
 86
 As we view the record evidence, the district court's imposition of fines in the amount of $1,100,000 was not an abuse of discretion. The nature of Marva Maid's activities, its earnings, the pecuniary loss inflicted on school districts, and the need to deprive Marva Maid of illegally obtained gains derived from its bid rigging collectively support the fines imposed in this case.
 
 
 87
 Marva Maid claims it was erroneous to consider the Norfolk overcharge because the Norfolk school district was not named in the indictment. However, Norfolk was properly considered a victim of the offense charged in the indictment and proved at trial because the indictment states "rigging bids submitted to certain school boards in the Commonwealth of Virginia." J.A. at 8.
 
 
 88
 Thus, while the indictment's "means and methods" section named eleven specific school districts, not including Norfolk, as victims of the bid rigging conspiracy (J.A. at 9-10), this was not an element of the offense that the government needed to prove. United States v. Miller, 471 U.S. 130, 136, 145 (1985). So long as the government does not broaden the charges in an indictment, it may present evidence at trial of overt acts that were not specifically enumerated in the indictment. United States v. American Waste Fibers Co., 809 F.2d 1044, 1046-47 (4th Cir. 1987) (indictment need not give all details of government's case or enumerate every possible legal and factual theory of defendant's guilt); United States v. Dunnigan, 944 F.2d 178, 181 (4th Cir. 1991); United States v, Butler, 884 F.2d 195, 199 (4th Cir. 1989); United States v. Stephenson, 924 F.2d 753, 761-62 (8th Cir.); cert. denied, 112 S. Ct. 63 (1991). Moreover, whether or not such evidence was admitted at trial, a court can and should consider the total amount of pecuniary loss to victims of a crime when determining an appropriate sentence. See United States v. Rothberg, 954 F.2d 217, 219, (4th Cir. 1991) (Sentencing Guidelines case).
 
 
 89
 In short, although the district court did not determine an exact loss, it was within the district court's discretion to impose the fines it did in this case.
 
 VIII
 
 90
 For the reasons stated herein, the defendant's convictions and sentences are affirmed.
 
 AFFIRMED
 
 
 [1]
 The appellant is composed of several divisions, including the Marva Maid Dairy, the principal focus of this prosecution. The appellant shall be referred to alternatively as "the Cooperative" or "Marva Maid."
 
 
 [2]
 References in the opinion to the procurement of milk or school milk con 6350 35 7 tracts will include milk and its associated products
 
 
 [3]
 Elliott was originally interested in getting the Hampton school account because of its close proximity to Marva Maid's operations, but settled on the Williamsburg contract, which is also relatively close to Marva Maid's operations
 
 
 [4]
 Because they knew what the bid prices were for the prior year and what cost increases had occurred during the school year, bidding "high" entailed submitting a bid that would "exceed that range sufficiently as to-not to be a real contender" on the contract. J.A. at 324, 327, 330
 
 
 [5]
 Elliott and Stamper essentially agreed on the approximate amount of their bids to deflect any signs of collusion or bid rigging
 
 
 [6]
 Shortly thereafter, Elliott was demoted in May 1986 and finally dismissed in December 1986. Elliott was not demoted for his bid rigging activities, rather he was dismissed because the board of directors believed Elliott was too aggressive in the marketplace and disliked the fact that he was destabilizing the market and upsetting the status quo. In July 1986, Neale took over as division manager at Marva Maid. Elliott testified that Neale was 6350 35 6 pleased about and condoned the bid rigging agreement
 
 
 [7]
 We recently granted appellant's motion to correct and supplement the record based on appellant's suggestion that there were "Elliott interview notes" submitted to Judge Doumar in a related case, United States v. Hughes, Cr. Action No. 92-25-N, United States District Court of the Eastern District of Virginia, Norfolk Division, that were not submitted to Judge MacKenzie. We have conducted an in camera inspection of the "Elliott interview notes" submitted to Judge Doumar in Hughes and conclude they are identical, with the following exception, to the notes submitted to Judge MacKenzie and this court. Notes taken by the government after the Cooperative's trial were also proffered to this court pursuant to its order granting appellant's motion to correct and supplement the record. These notes, taken by the government while interviewing Elliott, were obviously not required to be produced to Judge MacKenzie because they did not exist at the time of the Cooperative's trial
 
 
 [8]
 We also note that strictly applying the harmless test to the case at bar, any error was harmless beyond a reasonable doubt. Goldberg, 425 U.S. at 112
 
 
 [9]
 Courts have uniformly held that the limitations period extends until either final payments are received under the illegal contracts or the illicit gains are finally distributed among coconspirators. See United States v. Dynalectric Co., 859 F.2d 1559 (11th Cir. 1988); United States v. Evans & Associates Construction Co., 839 F.2d 656 (10th Cir. 1988); United States v. Northern Improvement Co., 814 F.2d 540 (8th Cir. 1987); A-A-A Electric, 788 F.2d at 245; United States v. Inryco, Inc., 642 F.2d 290 (9th Cir. 1981), cert. dismissed, 454 U.S. 1167 (1982)
 
 
 [10]
 Indeed, Elliott testified that he knew bid rigging was illegal
 
 
 [11]
 We also find no merit to Marva Maid's arguments that the district court's jury instruction on the Sherman Act count was improper, Smith Grading, 760 F.2d at 533 and Part VI, infra, and that its bid rigging agreement to fix the price of processed milk is exempt under the Sherman Act as "state action." Parker v. Brown, 317 U.S. 341 (1943)
 
 
 [12]
 Marva Maid's factual predicate for this argument is somewhat misleading. Elliott testified that he submitted a more competitive bid in 1985 only because of competition other than Pet Dairy. In the years 1984 and 1986, Marva Maid submitted non-competitive bids on the Newport News school milk contract
 
 
 [13]
 At its inception, the scheme to defraud intended to deprive the City of Newport News of money or property. Thereafter, Elliott decided to submit a "more competitive" bid when he became aware that other dairies were competing for the 1985-86 Newport News contract
 
 
 [14]
 We also find Marva Maid's contention that the district court's jury instruction on the mail fraud counts was improper to be without merit
 
 
 [15]
 Other dairies who pleaded guilty to similar conduct were fined between $300,000 and $6,000,000