**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Haynes Lee LOCKLEAR, d/b/a Riggs Motors, Defendant-Appellant.**

**No. 86–5616.**

United States Court of Appeals, Fourth Circuit.

Argued May 8, 1987.

Decided Sept. 30, 1987.

---

Stanley M. Dietz, Gaithersburg, for defendant-appellant.

Susan M. Ringler, Asst. U.S. Atty. (Breckinridge L. Willcox, U.S. Atty., Baltimore, Md., on brief), for plaintiff-appellee.

Before SPROUSE and CHAPMAN, Circuit Judges, and YOUNG, United States District Judge for the District of Maryland, sitting by designation.

PER· CURIAM:

Haynes Lee Locklear appeals from his jury conviction on ten counts of mail fraud and five counts of willful failure to retain mileage disclosure statements, which charges arose from a scheme to defraud used-car buyers. Locklear argues that the trial judge erred in denying his motion to suppress incriminating statements, and that the government failed to produce sufficient evidence to prove that appellant caused the mails to be used in furtherance of a fraudulent scheme. Finding no merit in appellant's contentions, we affirm.

I.

The evidence revealed that appellant Locklear had been in the used-car business since 1946. From 1981 to 1985, Locklear, trading under the name of Riggs Motors in Chillum, Maryland, bought and sold approximately 11,000 used cars. During this period, Walter Dickson purchased between four and five hundred automobiles from appellant. Locklear never furnished Dickson with federal odometer statements for the vehicles. Locklear did provide Dickson with the certificates of title and reassignment papers, but he purposely left blank the mileage reading on the reassignment portion of the title. This allowed Dickson to alter the mileage once the odometer had been rolled back by either Locklear or Dickson.

After Dickson purchased the vehicles, he obtained Maryland license plates and titles. The cars were then retitled in Virginia to reflect the lower mileages. Maryland customers who later purchased the cars from Dickson would unknowingly present the

fraudulent Virginia titles to the Maryland Motor Vehicle Administration, which issued Maryland titles to the consumers via the mail. These titles contained the false mileage readings.

In 1983, the Motor Vehicle Administration initiated an investigation into the used-car sales practices of Walter Dickson, his son, Douglas, and appellant Locklear. Investigator Eugene Frantz of the Administration informed Locklear that he could no longer sell cars to the Dicksons because neither one was a registered dealer. Thereafter, appellant arranged to have a District of Columbia dealer obtain D.C. reassignments of title, which were then provided to Dickson.

The incriminating statements which appellant contends should have been suppressed were made during an investigation by the FBI. Special Agent Stanley Orenstein met with Locklear several times between February and April 1985. The meetings occurred in various locations, including Locklear's office, a restaurant parking lot, the Montgomery County Police Station, FBI offices in Silver Spring, and by telephone. Certain of these locations were chosen to convenience Locklear, who traveled a great deal in his business. Eugene Frantz was present at all but one of the meetings.

During the first interview, appellant was advised that he was being questioned pursuant to a criminal investigation. He was also told that the agents wanted to see his paperwork regarding certain vehicle transfers. The agents never informed appellant that he was the target of a criminal investigation, and Locklear inferred that Dickson was the suspect. At no time was Locklear apprised of his *Miranda* rights, and at no time did he assert his Fifth or Sixth Amendment privileges. Appellant was free to leave the meetings at any time, and he often ended the interviews due to business engagements.

At a pretrial suppression hearing, Locklear testified that in 1982, Eugene Frantz told him that if Locklear failed to cooperate with the investigation, he would lose his license to operate as an automobile dealer.

Appellant argued that the statements he gave during the 1985 interviews were coerced as a result of this threat. The district court held that no *Miranda* warnings were required because appellant's 1985 interviews were non-custodial. The court further found that the government made no threat or inducement which might render appellant's statements involuntary, and it denied his motion to suppress.

II.

An individual confronted with potentially incriminating questions ordinarily must assert his Fifth Amendment privilege to avoid self-incrimination. If he answers the questions, his choice is considered voluntary since he was free to claim the privilege, *Minnesota v. Murphy*, 465 U.S. 420, 429, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984), and his statements are admissible in a criminal prosecution.

One well-known exception to this general rule addresses the problem of confessions obtained from suspects during custodial interrogation:

> [T]he prosecution may not use statements ... stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.... Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). On appeal, Locklear admits that the 1985 interviews were non-custodial. Thus, the agents' failure to give him *Miranda* warnings does not require that Locklear's remarks be suppressed. *Roberts v. United States*, 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622 (1980) (*Miranda*'s extraordinary safeguard does not apply outside the context of custodial interrogations). The fact that appellant was the target of the investigation does not alter this result. *Minnesota v. Murphy, supra,*

465 U.S. at 431, 104 S.Ct. at 1144 (mere fact that investigation has focused on a suspect does not trigger the need for *Miranda* warnings in non-custodial settings). *Accord Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

However, any incriminating statements made involuntarily would not be admissible at trial. *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). Locklear offers two reasons why his statements were involuntary: (1) the fact that the FBI agent failed to inform him that he was a target, and (2) threats allegedly made by Frantz or Orenstein.

In assessing voluntariness, a court must examine the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). An incriminating statement is deemed involuntary only if induced by such duress or coercion that the suspect's "will has been overborne and his capacity for self-determination critically impaired." *Id.* at 225, 93 S.Ct. at 2047. *Accord United States v. Seni*, 662 F.2d 277, 281–82 (4th Cir.1981), *cert. denied*, 455 U.S. 950, 102 S.Ct. 1453, 71 L.Ed.2d 664 (1982). The government bears the burden of proving by a preponderance of the evidence that the statement was voluntary. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). Although an appellate court must determine independently the ultimate issue of voluntariness, *Beckwith v. United States, supra*, 425 U.S. at 348, 96 S.Ct. at 1617; *United States v. Dodier*, 630 F.2d 232, 236 (4th Cir.1980),[1] the findings of the district court as to the facts surrounding the confession are to be accepted unless clearly erroneous. *United States v. Dodier, supra; United States v. Lewis*, 528 F.2d 312, 313 (4th Cir.1975).

■ At the suppression hearing, the trial judge heard conflicting testimony from Locklear and Agent Orenstein regarding an alleged threat in 1985 that if Locklear did not meet and cooperate with the agents at a specified time, he would lose his license. After assessing the witnesses' credibility and demeanor, the trial judge found that the government made no such threat. Absent compelling evidence to the contrary, this Court declines to overturn a factual determination founded on witness demeanor and credibility. *See United States v. Wolf*, 813 F.2d 970, 975 (9th Cir. 1987) (deference to the district court's factual finding is especially warranted when the critical evidence is testimonial).

■ As to the alleged threat made by Frantz in 1982, Frantz's words were interpreted by the trial judge to mean that if Locklear did not cooperate in refusing to sell cars directly to Dickson, then Locklear would lose his license. Locklear's testimony supports this interpretation.

The trial judge further determined that even if Frantz had threatened Locklear in 1982 that his failure to cooperate would result in the loss of his license, such a statement was too remote in time to render his 1985 statements involuntary. The record reflects that the agents never told Locklear in 1985 that he was required to answer questions, nor was his freedom of movement restrained during the meetings. Several of the interviews were arranged to accommodate Locklear's schedule, and he was free to end them at any time. In addition, the interviews were not an exercise in endurance. The longest meeting lasted approximately two hours, and that was due to the volume of documents that had to be examined. Locklear was an experienced businessman, and his perception of events was at no time impaired by the influence of drugs or alcohol. Thus this Court agrees that, given the totality of circumstances, the alleged threat in 1982 was not so coercive that in 1985, the appellant's will was overborne and his capacity for self-determination critically impaired.

Similarly, the agents' failure to inform Locklear that he was a suspect could not have overcome a genuine desire to remain

---

**1.** *See also Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985) (in habeas corpus proceedings, federal courts need not defer to a state court's finding that a confession was voluntary because "the ultimate issue of 'voluntariness' [for purposes of 28 U.S.C. § 2254(d)] is a legal question requiring independent federal determination").

silent. Locklear knew the agents were involved in a criminal investigation and that Dickson was a target. Appellant had been warned in 1983 not to sell cars to Dickson. Since Agent Orenstein asked to review many of the car sales that appellant engaged in with Dickson, Locklear could reasonably have inferred that the FBI might be investigating his own business dealings. Locklear's contention that the agents' "deception" about his being a target vitiated the voluntariness of his statements is unfounded.

We conclude, based upon an independent evaluation of the record and with appropriate deference to the trial court's findings of fact, that Locklear's statements were voluntary. Consequently, we find no error resulted from admitting his statements into evidence.

### III.

■ Appellant next contends that the government produced insufficient evidence to prove that he used the mails to further a fraudulent scheme. A conviction for mail fraud requires proof of (1) a scheme to defraud (2) which involves use of the mails (3) in furtherance of the scheme. 18 U.S.C. § 1341; Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). In deciding whether the evidence supports Locklear's conviction, this Court must view it in the light most favorable to the government. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Snowden, 770 F.2d 393, 397 (4th Cir.), cert. denied, 474 U.S. 1011, 106 S.Ct. 540, 88 L.Ed.2d 470 (1985).

Appellant admits that the evidence adduced at trial proved that Locklear had hired an individual to reset automobile odometers. He argues that his participation in the fraudulent scheme ended when he sold the cars to Dickson, who then obtained new titles in Virginia without using the mails. Appellant contends there was no evidence that he had any control over who subsequently purchased the vehicles from Dickson, or whether they would obtain Maryland titles by mail. Thus,

Locklear asserts, he did not use or cause the mails to be used for the purpose of defrauding customers.

"Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." Pereira, supra, 347 U.S. at 8–9, 74 S.Ct. at 363. The government need not show that Locklear mailed anything himself, United States v. Shaid, 730 F.2d 225, 229 (5th Cir.), cert. denied, 469 U.S. 844, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984), nor that he intended the mails be used to carry out the fraud. United States v. Reed, 721 F.2d 1059, 1060–61 (6th Cir.1983).

The evidence produced at trial showed that Locklear was a veteran of the used-car business. Between 1981–1985, he purchased approximately 11,000 used cars from twenty-five dealers in the suburban Washington, D.C. area. He was well-acquainted with the paperwork generated by automobile sales, specifically the titling and reassignment of titles to vehicles. Such paperwork was routinely provided to him by dealers, and he in turn provided the necessary papers to Dickson upon transferring a car to him.

The government introduced numerous certificates of title, reassignments, and applications for Virginia titles involving cars sold by Locklear to Dickson. These exhibits represented the paperwork used to obtain Virginia titles. Appellant's habit of leaving blank the mileage reading on the reassignment portion of the certificates of title indicated he knew of the fraudulently obtained titles. The government also introduced copies of the Maryland certificates of title that were later mailed to the retail customers who ultimately purchased these cars from Dickson.

From this evidence, a jury could infer that it was reasonably foreseeable to Locklear that certificates of title would be mailed to the consumer from the Motor Vehicle Administration, and that the certificates would reflect the fraudulent odometer readings. Thus, there was sufficient

evidence to show that appellant "caused" the mails to be used in furtherance of a fraudulent scheme.

Accordingly, the judgment of conviction is

AFFIRMED.