**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                              No. 95-5283

DOUGLAS A. RIVENBARK,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                              No. 95-5289

DOUGLAS A. RIVENBARK,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert R. Merhige, Jr., Senior District Judge.
(CR-94-93)

Argued: January 31, 1996

Decided: April 1, 1996

Before ERVIN and WILLIAMS, Circuit Judges, and BUTZNER,
Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** George A. Somerville, MAYS & VALENTINE, Richmond, Virginia, for Appellant. Mary Hannah Lauck, Assistant United States Attorney, Richmond, Virginia, for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Douglas Rivenbark appeals his convictions in two jury trials.[1] In the first trial, Rivenbark was convicted of six counts of bank fraud, see 18 U.S.C.A. § 1344 (West Supp. 1995), one count of wire fraud, see 18 U.S.C.A. § 1343 (West Supp. 1995), and one count of mail fraud, see 18 U.S.C.A. § 1341 (West Supp. 1995). In the second trial, Rivenbark was convicted of one count of possession of a firearm by a convicted felon, see 18 U.S.C.A. § 922(g)(1) (West Supp. 1995). Although Rivenbark raises a host of alleged errors, all of his contentions are meritless; accordingly, we affirm his convictions.

I.

Viewed in the light most favorable to the Government, see Glasser v. United States, 315 U.S. 60, 80 (1942), the facts are as follows. Rivenbark's convictions stem from his attempts to defraud the estate of his wealthy neighbor, George Verlander. At the time of Verlander's death on June 4, 1994, Rivenbark resided nearby in a house

_____

[1] Originally, all nine charges were consolidated in one trial; on the day the trial commenced, the district court granted Rivenbark's motion to sever the firearms charge.

owned by his girlfriend, Charlotte Paone. Verlander was a wealthy man and had amassed an estate worth close to seven million dollars when he died. Shortly after Verlander's death, Jack Neal, a close family friend of Verlander and executor under his 1986 will, observed Paone exiting the back door of Verlander's home, appearing "pretty well rattled[ ] and acting strange." (J.A. at 105.) When Neal subsequently reviewed Verlander's financial records, he noted that the March 1994 statement for Verlander's primary checking account at the Chesapeake National Bank (CNB), including cancelled checks, was missing. Included in the missing cancelled checks were two legitimate checks that were paid to Rivenbark, one for $4,200 and one for $4,700. Neal also could not locate the book of blank checks that sequentially followed the book of checks that Verlander had been using when he died, nor could he find any blank checks for a Merrill Lynch Cash Management Account that Verlander had closed two years earlier. When the cash management account had been open, Verlander had issued checks from the account only for tax and tax-related payments.

Just after Verlander's death, six checks ostensibly issued by Verlander and made payable to Rivenbark surfaced. The six checks were dated between June 1 and June 3, 1994, just prior to Verlander's death on June 4. Two of the checks, dated June 1, were in the amount of $4,200 each; two of the checks, dated June 2, were in the amount of $4,700 each; and the final two checks, dated June 3, were in the amount of $150,000 each. Three of the checks were written on Verlander's CNB account; the other three checks were written on the closed Merrill Lynch account. The three checks written on the CNB account were from the missing book of checks, and none of the checks had been entered on Verlander's check register for either account. At trial, Thomas Goyne, a forensic expert on questioned documents, testified that all six checks were forged and had been produced by simulation, tracing, or some other imitation method.

Despite the fact that all of the checks were dated before June 4, Rivenbark deposited the four checks that were for smaller amounts into his business account in piecemeal fashion at three different CNB locations over the course of two days.**2** He made one deposit on June

_____

**2** Rivenbark owned and operated a service station in the nearby town of Kilmarnock; the business subsequently failed.

3

7 at the Irvington branch of CNB, another deposit on June 7 at the Lively branch of CNB, and a final deposit on June 8 at the Kilmarnock branch of CNB. One bank employee testified that she was surprised to see Rivenbark and Paone at her drive-in window in Irvington because she had previously worked at the Kilmarnock branch and was accustomed to seeing them there.

Rivenbark never attempted to cash either of the $150,000 checks, one of which was drawn on the CNB account and the other on the closed Merrill Lynch account. In the year before the checks were written, the CNB account balance averaged approximately $25,000 and never exceeded $38,000; the Merrill Lynch account had had no balance since 1992 and the last check had posted May 1, 1992. Special Agent Charles Hagan of the Federal Bureau of Investigation testified that in his search of Verlander's bank records from February 1993 to May 1994, he did not identify any checks issued by Verlander that were returned for insufficient funds.

At trial, George Mahoney, an acquaintance of Rivenbark, testified that Rivenbark offered him $25,000 to testify falsely that he had seen Verlander write two checks payable to Rivenbark for $150,000 each. Another witness, a CNB employee, testified that an anonymous caller asked whether a $150,000 check would clear on Mr. Verlander's account. Additionally, Pamela Koerber, a Merrill Lynch employee, testified that another Merrill Lynch division referred to her a call from a man who reluctantly identified himself as Rivenbark. The caller stated that he was a friend, neighbor, and business acquaintance of Verlander and asked whether a $150,000 check would clear Verlander's cash management account. After being told the account had been closed for two years, the caller hung up. Phone records verified that a telephone call had been placed from Paone's residence to the Merrill Lynch office.

Shortly thereafter, Rivenbark filed a complaint with the FBI, prompting Agent Hagan to meet with Rivenbark on July 22, 1994. Rivenbark showed Agent Hagan the two $150,000 checks and complained that a conspiracy existed between Neal and other individuals connected with Verlander's estate to deprive Rivenbark of the proceeds from the checks. Additionally, Rivenbark alleged the same conspirators sought to prevent the probate of a second will of Verlander

4

dated May 29, 1994 (the May 29 will), which expressly revoked Verlander's 1986 will that had named Neal as executor. The May 29 will surfaced when it was received in the mail on June 27, 1994, by the Clerk of Court in Lancaster County.

Verlander had drafted the 1986 will with the assistance of Neal and Dexter Rumsey, the former chair of the Virginia State Bar Section on Wills, Trusts, and Estates. The will provided for the creation of three trusts at Verlander's death: a marital trust for his wife, Cornelia; a second, smaller trust for the benefit of his step-siblings; and a charitable trust to provide educational opportunities for the poor children of Weems, Virginia.

The terms of the May 29 will sharply departed from the terms of the 1986 will. In the May 29 will, which was never probated because it was not properly witnessed, Verlander provided nothing to the children of Weems, nothing to his step-siblings, and devised only his interest in their modest home to his wife. Instead, Verlander named Rivenbark as executor, left the bulk of the estate to Paone, and released any loans payable by Rivenbark to Verlander, calling Rivenbark "the son I never had." (J.A. at 454.) At trial, Goyne testified that Verlander's signature on the will had been forged.

A third will, dated June 2, 1994 (the June 2 will), surfaced on October 10, 1994, and was probated in the Lancaster County clerk's office. Rivenbark, Chester Henry, and Gary Willis had witnessed the will, and the will stated that its terms were not to be made public until ninety days after Verlander's death. Curiously, Rivenbark did not mention the existence of the June 2 will in his July 22 meeting with Agent Hagan. The monetary provisions varied only slightly from those of the May 29 will, again leaving the bulk of the estate to Paone. In the June 2 will, Verlander stated that the reason for the large bequest to Paone was because Paone had been "a great companion" and Paone's son "could verry possible[sic] be my son and my only son." (J.A. at 459.)

At trial, Henry testified that Rivenbark coerced him to witness the June 2 will. Henry stated that he signed the will as a witness after Verlander's death and that, at the time, the will had no signatures on it. When Henry asked Rivenbark how he was going to get Verlander's

5

signature on the will, Rivenbark described the method he would use to forge Verlander's signature. Goyne testified that Verlander's signature on the June 2 will was indeed a forgery. In a subsequent search of Rivenbark and Paone's home, investigators found a book entitled You and the Law. The chapter on estates and wills was heavily highlighted, and the sections describing how to disinherit a relative intentionally and how to appoint an executor were explicitly marked.

Rivenbark was indicted on nine felony counts in the United States District Court for the Eastern District of Virginia. In the first jury trial, Rivenbark was convicted of eight fraud counts and sentenced to eight concurrent terms of 105 months imprisonment. In the second jury trial, he was convicted of the firearms charge and sentenced to 60 months imprisonment to be served concurrently with the other eight terms. Although Rivenbark appeals his convictions on numerous grounds, we limit our written discussion to Rivenbark's three main arguments: (1) whether Rivenbark suffered ineffective assistance of counsel at trial, in violation of the Sixth Amendment; (2) whether the Government offered sufficient evidence at trial to sustain his convictions for bank fraud and mail fraud; and (3) whether the district court erred in denying Rivenbark's motion for a continuance of the firearms trial.[3] We address these contentions seriatim.

II.

Rivenbark's primary contention on appeal is that he suffered ineffective assistance of counsel. According to Rivenbark, the district court erred by failing to heed the "danger signals" of Rivenbark's alleged ineffective assistance of counsel and in failing to inquire into the adequacy of Rivenbark's counsel. In advancing this claim, Rivenbark cites eleven specific instances of alleged ineffective assistance of counsel, which can be classified into four categories: (1) alleged failure to comply with procedural rules, namely failing to file a wit-

_____

[3] Law enforcement officers located the evidence supporting the firearms conviction when they searched Rivenbark and Paone's home in conjunction with their fraud investigation. In the search, Agent Hagan discovered two fully-loaded assault rifles, two fully-loaded semi-automatic pistols, and a letter from the Virginia Department of Corrections advising Rivenbark that he could not possess a firearm.

ness list with the district court; (2) unsuccessful trial strategy; (3) alleged failure to relay information; and (4) inadequate cross-examination of Government witnesses.

We have consistently observed that a claim of ineffective assistance of counsel is more properly raised on collateral review than on direct review. See, e.g., United States v. Smith, 62 F.3d 641, 651 (4th Cir. 1995); United States v. Matzkin, 14 F.3d 1014, 1017 (4th Cir. 1994); United States v. Percy, 765 F.2d 1199, 1205 (4th Cir. 1985). Thus, Rivenbark's challenge to his counsel's assistance is properly brought by a motion to set aside his sentence under 28 U.S.C.A. § 2255 (West 1994). A narrow exception to this precept is that a reviewing court will address a claim of ineffective assistance of counsel on direct appeal if the record conclusively discloses that defense counsel failed to provide effective representation. **4** See United States v. Gastiaburo, 16 F.3d 582, 590 (4th Cir.) (recognizing the exception, but failing to apply it because the record did not"conclusively demonstrate" that counsel was ineffective), cert. denied, 115 S. Ct. 102 (1994); Matzkin, 14 F.3d at 1017 (declining to address a claim of ineffective assistance of counsel because counsel's alleged ineffectiveness was not conclusively apparent from the record). Unless, therefore, the record conclusively demonstrates that Rivenbark's counsel was ineffective, we shall not review this claim on direct appeal. The reason for our reticence to address such a claim on direct review is clear: "The issue was not preserved on the record below, and it would be unfair to adjudicate the issue without any statement from counsel on the record," United States v. DeFusco, 949 F.2d 114, 120 (4th Cir. 1991), cert. denied, 503 U.S. 997 (1992), and without an adequate record to resolve the issue, "it is impossible to make a

_____

**4** Another exception to the general rule exists: Under Federal Rule of Criminal Procedure 33, the district court on the defendant's motion may grant a new trial predicated on ineffective assistance of counsel if required in the interest of justice. See United States v. Smith, 62 F.3d 641, 648 (4th Cir. 1995). The defendant's motion, however, "must be brought, if at all, within seven days of judgment regardless of when the defendant becomes aware of the facts which suggested to h[im] that h[is] attorney's performance may have been constitutionally inadequate." Id. Because Rivenbark did not comply with the jurisdictional requirements of Rule 33, we need address this exception no further.

7

reasoned judgment as to whether or not representation was ineffectual," United States v. Lurz, 666 F.2d 69, 78 (4th Cir. 1981), cert. denied, 455 U.S. 1005 (1982).

Application of these precepts compels us to conclude that we cannot review Rivenbark's claim of ineffective assistance of counsel on direct appeal because the record does not conclusively demonstrate that his counsel was constitutionally ineffective. For example, Rivenbark claims that he was unable to present a defense in the first trial because his counsel failed to submit a witness list on time. The record does not conclusively support this allegation; we could just as easily infer from the record that although the district judge was unhappy with the tardiness of Rivenbark's counsel in submitting the witness list, he would have permitted Rivenbark to call the witnesses had Rivenbark chosen to do so. Rather, Rivenbark's counsel appears to have made the tactical decision not to call the witnesses at trial. As another example, Rivenbark complains that he is unable to conceive of any reason why his trial counsel introduced into evidence Henry's written statement to Special Agent Hagan alleging that Rivenbark attempted to bribe Henry to witness the June 2 will and then threatened to harm him if he did not witness the will. We believe, however, that the record is clear that Rivenbark's counsel entered the statement into evidence to impeach Henry: In his trial testimony, Henry claims that Rivenbark demonstrated how he could forge Verlander's signature; in the contemporaneous written statement, Henry makes no mention of this crucial part of the conversation. Given the nature of his allegations, Rivenbark has failed to prove that the record conclusively discloses that his trial counsel was constitutionally ineffective. Thus, we do not address the issue on direct appeal. See Gastiaburo, 16 F.3d at 590.

III.

Next, Rivenbark challenges the sufficiency of the evidence to sustain his convictions for bank fraud and mail fraud. Our review of the evidence, however, leads to the conclusion that the evidence is sufficient to sustain the convictions.

In United States v. Glasser, 315 U.S. 60 (1942), the Supreme Court explained that a jury verdict "must be sustained if there is substantial

8

evidence, taking the view most favorable to the Government, to support it." Id. at 80 (emphasis added). A reviewing court, therefore, may not overturn a substantially supported verdict merely because it finds the verdict unpalatable or determines that another reasonable verdict would be preferable. Rather, we shall reverse a verdict only if the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt. See Burks v. United States, 437 U.S. 1, 17 (1978). In the context of a criminal action, substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. See United States v. Smith , 29 F.3d 914, 917 (4th Cir.), cert. denied, 115 S. Ct. 454 (1994). In applying this standard of review, we must remain cognizant of the fact that"[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." United States v. Murphy , 35 F.3d 143, 148 (4th Cir. 1994) (citations omitted), cert. denied, 115 S. Ct. 954 (1995). Thus, the appellate function is not to determine whether the reviewing court is convinced of guilt beyond reasonable doubt, but, viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government, whether the jury could have found the elements of the crime beyond a reasonable doubt.

Critical to our review of sufficiency challenges is the complete picture that the evidence presents. See United States v. Al-Talib, 55 F.3d 923, 931 (1995). We do not examine evidence in a piecemeal fashion, but consider it in cumulative context. See, e.g. , Kyles v. Whitley, 115 S. Ct. 1555 (1995); Glasser, 315 U.S. at 80-81. The focus of appellate review, therefore, of the sufficiency of evidence to support a conviction is on the complete picture, viewed in context and in the light most favorable to the Government, that all of the evidence portrayed. Guided by these principles, we review the evidence on which Rivenbark's convictions were rendered.

A.

Rivenbark was convicted of bank fraud, in violation of 18 U.S.C.A. § 1344. In order to prove bank fraud, the Government had to establish beyond a reasonable doubt that: (1) Rivenbark made a false statement

9

to a federally insured bank; (2) the false statement was made for the purpose of influencing the bank's action; (3) the false statement was knowingly made; and (4) the statement was false regarding a material fact. See United States v. Whaley, 786 F.2d 1229, 1231 (4th Cir. 1986). Rivenbark contends that he did not know the four checks were forged when he deposited them, thereby disputing that the Government established the third element of the crime, but conceding that the Government established the remaining elements of the crime beyond a reasonable doubt.

After carefully reviewing the record, we conclude that a reasonable jury could have found that Rivenbark knew the checks were forged when he deposited them. Government witness Chester Henry testified that Rivenbark informed him that he could forge Verlander's signature. In addition, three bank tellers testified that Rivenbark personally deposited four checks into his account in three different transactions at three different branches over a two-day period, even though he possessed all six forged checks at the time of the first deposit. Also, Government witness George Mahoney testified that Rivenbark attempted to bribe him with $25,000 in exchange for Mahoney testifying falsely that Mahoney witnessed Verlander sign the two $150,000 forged checks payable to Rivenbark. Based on this testimony, the jury was certainly entitled to conclude that Rivenbark knew the checks were forged.

B.

Rivenbark also asserts that the evidence was insufficient to sustain his conviction for mail fraud, in violation of 18 U.S.C.A § 1341. In order to establish mail fraud, the Government had to prove beyond a reasonable doubt that: (1) Rivenbark engaged in a scheme to defraud; (2) by using the mails; (3) in furtherance of the scheme. See United States v. Locklear, 829 F.2d 1314, 1318 (4th Cir. 1987). While implicitly conceding that the evidence establishes that someone mailed a forged will to the clerk's office, Rivenbark posits that the Government failed to demonstrate that he was the one who used the mails. According to Rivenbark, the jury could have just as reasonably concluded that Paone mailed the forged instrument.

10

Again, we cannot accept Rivenbark's position because a rational jury could conclude that Rivenbark could foresee the use of the mails. In Locklear, we explained that

> "[w]here one does an act with knowledge that the use of the mails will follow . . . , or where such use can reasonably be foreseen, even though not actually intended, then he causes the mails to be used." The government need not show that [the defendant] mailed anything himself, nor that he intended the mails to be used to carry out the fraud.

Id. (citations omitted) (quoting Pereira v. United States, 347 U.S. 1, 8-9 (1954)). Ample evidence indicated that Rivenbark devised the scheme to defraud Verlander's estate. For instance, Henry testified that Rivenbark told him he knew how to trace Verlander's signature with a pen and that Rivenbark coerced him to witness the June 2 will. Also, Rivenbark pursued validation of the forged May 29 will while meeting with Agent Hagan, despite the fact that Rivenbark had witnessed the superseding, and also forged, June 2 will. Thus, Rivenbark's assertion that Paone actually mailed the forged May 29 will is of no moment. See United States v. Odom, 736 F.2d 104, 109 (4th Cir. 1984) ("It is plainly not necessary . . . that the one charged be the one who physically did the mailing . . . ."). We therefore conclude that there was sufficient evidence to sustain the mail fraud conviction. See Locklear, 829 F.2d at 1318.

IV.

The final challenge that we discuss is Rivenbark's contention that the district court erred by denying his motion for a continuance of the firearms trial. According to Rivenbark, he was precluded from mounting a defense to the firearm possession charge because his counsel failed to return his telephone calls. Rivenbark asserts that this failure resulted in his counsel's inability to subpoena thirteen material witnesses who allegedly would have proffered testimony that Rivenbark did not possess the firearms.

For Rivenbark "[t]o prove that the denial of the continuance constitutes reversible error, [he] must demonstrate that the court abused its `broad' discretion and that he was prejudiced thereby." United States

11

v. Bakker, 925 F.2d 728, 735 (4th Cir. 1991) (quoting United States v. LaRouche, 896 F.2d 815, 823 (4th Cir.), cert. denied, 496 U.S. 927 (1990)). An abuse of discretion has occurred only if the record reflects an "unreasoning and arbitrary `insistence upon expeditiousness in the face of a justifiable request for delay.'" Morris v. Slappy, 461 U.S. 1, 11-12 (1983) (quoting Ungar v. Sarafite, 376 U.S. 575, 589 (1964)). Under the facts of this case, we cannot conclude that the district court abused its discretion when it denied Rivenbark's motion.

The district court denied the motion to continue because it determined that Rivenbark's counsel had not failed to subpoena any material witnesses. Of the thirteen witnesses Rivenbark sought to subpoena, eleven appeared on the witness list that Rivenbark submitted to the court before the first trial and before the firearms charge was severed. Rivenbark's counsel had investigated these witnesses before trial and found them to be of no assistance to Rivenbark's defense. As for Paone, another witness on the list of thirteen, Rivenbark's counsel stated at trial that he did not plan to call her as a witness for the defense. The final witness on the list, George Mahoney, was available at trial because he testified for the prosecution. Because the record does not reflect that any of the unavailable witnesses on Rivenbark's list would have been helpful to his defense, we hold that the district court did not abuse its discretion in denying Rivenbark's request for a continuance.

V.

We conclude that the record does not conclusively demonstrate that Rivenbark's counsel was constitutionally ineffective; hence, we do not review that claim on direct appeal. Reviewing the sufficiency of the evidence, we conclude that it was sufficient to sustain Rivenbark's convictions beyond a reasonable doubt. Finally, we hold that the district court did not abuse its discretion in denying Rivenbark's motion for a continuance. We have carefully examined Rivenbark's

12

remaining assignments of error and conclude that they are without merit.**5** The judgment of the district court is affirmed.

AFFIRMED

_____

**5** Rivenbark also raised the following claims in his appellate brief: (1) The district court impermissibly admitted the testimony of Pamela Koerber because it was hearsay; (2) the admission of evidence that Rivenbark possessed firearms between March and July of 1994 either impermissibly constructively amended the indictment, or, alternatively, constituted a variance between the indictment and the evidence adduced at trial; (3) the district court failed to conduct an adequate hearing before allowing Rivenbark to appear pro se in the second trial; and (4) the district court committed plain error when it sua sponte limited the cross-examination of Henry. These challenges are clearly meritless under the facts and law.