COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Beales, Causey and Senior Judge Haley
Argued at Richmond, Virginia


AUGUSTUS ANDRE DAMON RHODES, A/K/A
  AGUSTUS ANDRE DAMONE RHOADES
                                                    MEMORANDUM OPINION* BY
v.       Record No. 0697-22-2                       JUDGE JAMES W. HALEY, JR.
                                                            OCTOBER 3, 2023
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Ricardo Rigual, Judge

(Thomas E. Dodd, III; Strentz Greene & Coleman, PLC, on brief),
for appellant.  Appellant submitting on brief.

Rebecca M. Garcia, Assistant Attorney General (Jason S. Miyares,
Attorney General; Leanna C. Minix, Assistant Attorney General, on
brief), for appellee.


Following a jury trial, the Circuit Court of Spotsylvania County convicted Augustus

Andre Damon Rhodes of first-degree felony murder, in violation of Code § 18.2-32, abduction,

in violation of Code § 18.2-47, using a firearm in the commission of a felony, in violation of

Code § 18.2-53.1, filing a false police report, in violation of Code § 18.2-461, brandishing a

firearm, in violation of Code § 18.2-282,[1] recklessly handling a firearm, in violation of Code

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The indictment charged Rhodes with brandishing a firearm but mistakenly cited Code
§ 18.2-462.  An "[e]rror in the citation of the statute" in an indictment "will not be grounds for
. . . reversal of a conviction" absent a showing of prejudice.  Rule 3A:6.  The sentencing order
also incorrectly cites Code § 18.2-462 for Rhodes's conviction for brandishing a firearm.
Although the order misidentifies the code section, it properly describes the offense described in
the indictment and presented to the jury.  Accordingly, we remand to the trial court for the
limited purpose of correcting the clerical error in the sentencing order.  *See* Code § 8.01-428(B);
*Carr v. Commonwealth*, 69 Va. App. 106, 110 n.1 (2018).

§ 18.2-56.1, assault and battery, in violation of Code § 18.2-57, and common law trespass, in violation of Code § 1-200. On appeal, he argues that the trial court erred by (1) denying his motion to suppress statements he made to law enforcement and (2) finding the evidence sufficient to convict him of first-degree felony murder, abduction, and use of a firearm in the commission of a felony.[2] We affirm.

## BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party [below]." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). This standard requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence]." *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021) (alteration in original) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)).

After a grand jury indicted Rhodes with multiple offenses following the August 12, 2019 killing of James Wallin, Rhodes moved to suppress statements he made to Spotsylvania County Sheriff's Detective Tony Horn. Surveillance footage from Spotsylvania Regional Medical Center ("SRMC") showed a silver car pull into the emergency room parking lot on August 12. Rhodes exited the vehicle, walked into the hospital under his own power, spoke to a nurse, and went to the emergency room. Rhodes was wearing dark pants and a white tank top covered in blood but did not appear to be in distress or have difficulty walking.

---

[2] Although Rhodes's second assignment of error challenges each of his convictions, his argument challenges only the three convictions listed above. He therefore forfeits any challenge to his remaining convictions. *See* Rule 5A:20(e) (requiring argument and authorities relating to each assignment of error).

- 2 -

Spotsylvania County Sheriff's Deputy Margarida McBride spoke to Rhodes at SRMC, took photographs of his injuries, and collected his clothes. Rhodes told Deputy McBride that he did not know who shot him, that he was sitting down near a crowd of people when it happened, and that he "just woke up super dizzy." Medical staff told Deputy McBride that Rhodes had nine bullet wounds.

Rhodes was then transported to Mary Washington Hospital ("MWH") in an ambulance with Spotsylvania County Sheriff's Deputy Ashlie Miller. Rhodes correctly answered basic questions from hospital staff such as his name, location, and day of the week. When an ambulance worker asked Rhodes what happened, Rhodes responded that "somebody tried to beat [him] up and take [his] stuff." He claimed that he was "chilling" by himself when someone attacked him "out of nowhere." He denied that he ever saw the attacker.

Detective Horn interviewed Rhodes at MWH on August 12, a few hours after Rhodes checked into the SRMC emergency room. Although Detective Horn read Rhodes some of his *Miranda*[3] rights, he failed to inform Rhodes that Rhodes had the right to have an attorney present even if he could not afford one. Detective Horn characterized the conversation as "easygoing" and testified that Rhodes "didn't seem stressed out." Rhodes was alert, was not under arrest, and was free to move around the hospital room. Detective Horn did not touch or restrain Rhodes in any way.

Detective Horn repeatedly characterized Rhodes as the victim during the interview. Rhodes claimed that he was attacked from behind while walking and never saw his attacker. He denied using his firearm. Rhodes told Detective Horn that he used to work in intelligence collection for the United States Army and expressed familiarity with interrogation techniques. The interview was cordial; Rhodes expressed a desire to have coffee with Detective Horn and

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

asked if Detective Horn would provide him guidance and mentorship. Rhodes even inquired at one point whether Detective Horn could get him a job in law enforcement and asked Detective Horn for his card. The interview lasted just over half an hour.

Detective Horn interviewed Rhodes at MWH again on August 13 and August 14. Detective Horn did not provide any *Miranda* warnings before these two interviews, each of which lasted 30 to 45 minutes.

Rhodes did not move to suppress his statements to Deputies McBride or Miller but argued that his statements to Detective Horn should be suppressed because Detective Horn did not provide effective *Miranda* warnings on August 12, 13, and 14. Rhodes further argued that his will was overborne on August 12 but conceded that his statements on August 13 and 14 were not coerced. The Commonwealth responded that Rhodes was not in custody during his interviews with Detective Horn and that *Miranda* warnings were therefore not required. The Commonwealth also argued that Rhodes's statements on August 12 were voluntary and not coerced. After conducting a thorough discussion of the interview recordings, the trial court concluded that Rhodes was not in custody during any of the interviews and that his statements were voluntary. Accordingly, the court denied Rhodes's suppression motion.

The case proceeded to trial. Read in the light most favorable to the Commonwealth, the evidence at trial showed the following. Melinda Wallin owned a townhouse where she lived with her two children—James and Alyssa Wallin—and Alyssa's infant daughter.[4] The Wallins' home shared a concrete stoop with the neighbors' home, owned by Donald Brown. On August 1, 2019, law enforcement executed a search warrant at Brown's home in which they recovered a substantial amount of marijuana and cash. Melinda testified that, in the days after the "raid," she noticed "several cars that would come slowly in front of our house . . . creeping in a slow, very

---

[4] For clarity, this opinion refers to members of the Wallin family by their first names.

slow pace, and they never got out of their car." "It worried [her] quite a bit"; eighteen-year-old James started openly carrying a firearm after the raid.

On August 12, 2019, James and Alyssa sat on the stoop with their friend—Brian Hart—while Melinda was inside the house. James had a firearm visible inside a holster on his hip and was drinking a beer. Alyssa observed a silver Cadillac "driving very slowly past us. It was creeping almost." Hart also observed a car "creeping" along slowly. This testimony was corroborated by a neighbor's security camera.

The car stopped in the street, and a man in a white shirt, dark jeans, and dark shoes—later identified as Rhodes—got out and approached the stoop. Neither Alyssa nor Hart had ever seen Rhodes before. Alyssa testified that Rhodes initially appeared lost, "[l]ike he was looking for a specific house number," but walked toward the Wallins quickly and "[a]ggressive[ly]" upon noticing them. Rhodes asked who owned the house. James responded that he lived there, after which Rhodes asked again who owned the house, this time "more aggressive[ly]." Hart remembered Alyssa telling Rhodes that "he had the wrong place" and asking him to leave. Alyssa testified that Rhodes "was extremely close . . . right there in the grass" and she was scared. Hart testified that he was "nervous."

After Rhodes asked a third time who owned the house, this time "very aggressive" according to Alyssa, James stood up and answered, "me, mother fucker," and put his hand on his gun holster. James did not move toward Rhodes but instead "backed up a little bit like to where [Alyssa] was standing." Rhodes responded that he "[did not] understand why [James was] getting all angry with [him]." Alyssa and Hart each testified that Rhodes then quickly pulled a gun that had been tucked into his back belt loop, grabbed James's throat, shoved him against Brown's storm door, and placed the gun against James's head. Hart and Alyssa ran inside the Wallins' house. Hart testified that the last thing he saw was James push Rhodes's gun-carrying

hand away from James's head and Rhodes fire in the air. Alyssa testified that the last thing she saw was Rhodes pinning James against the door and the flash of a gun out of the corner of her eye. Neither saw James pull out his gun. Alyssa heard more gunshots while she was inside and called 911.

Melinda testified that she heard a "man screaming at [her] son" followed by what sounded "like a body that just hit in to a storm door." She heard them both fighting and then heard "[s]ix shots [go] off really fast" with "like seconds between." She then heard another shot from a different gun. Donald Brown testified that he was awoken by "a thump on the side of the building" and what he "first thought were firecrackers." He looked out his window and saw two people on the ground "kind of tussling, maybe one had the other pinned down," followed by "another firecracker, shot."

The neighbors' surveillance cameras showed a man wearing a white shirt and dark pants throw a man in a white shirt and light pants to the ground and get on top of him. While they wrestled, there was a flash of light. One of the cameras showed another man, later identified as William McDowney, exit the Cadillac and go toward the fight. The cameras showed another flash of light which Spotsylvania County Sheriff's Detective James Harris opined could have been the muzzle flash of a firearm. The man in dark pants was on top of the man in light pants during both flashes. Rhodes and McDowney then ran back to the car and drove away. Melinda ran outside and found James "bleeding from his head" and noticed that "he was shot in the chest." James died from his wounds.

The Commonwealth played the SRMC surveillance footage. The footage showed that, after Rhodes exited the Cadillac, McDowney parked the vehicle and approached a field near the hospital. The police searched that field and recovered two Glock 9mm handguns. One firearm, which had Rhodes's blood on it and an empty magazine, belonged to James. Police found two

- 6 -

bullets and five cartridge casings matching James's firearm on the pavement in front of the Wallins' townhome. The location of the casings and bullets indicate that someone fired James's firearm toward the street while standing on the lawn next to the stoop. James's blood was found near the cartridge casings.

A federal Bureau of Alcohol, Tobacco, Firearms and Explosives trace showed that Rhodes purchased the other 9mm firearm in April 2019. Police recovered one cartridge casing at the Wallins' home that had been fired from that firearm. Finally, police recovered a .45 caliber handgun in front of the Wallins' home and one cartridge casing that had been fired from that firearm. Rhodes purchased the .45 caliber firearm in June 2019. That handgun had blood on the grip and hammer for which James could not be eliminated as a contributor.

Medical examiner Dr. Jocelyn Posthumus testified that James had a head injury that was "consistent with a pistol whip" and a bullet wound that entered the back of his right shoulder and exited the front left side of his body after piercing his ribcage, spine, and left lung and causing significant internal bleeding. She opined that James died from the gunshot wound and the contributing blunt-force injury to the head.

The Commonwealth presented portions of the body camera footage from Deputies Miller and McBride in their case in chief but did not submit any of Rhodes's statements from his interviews with Detective Horn. The Commonwealth also played portions of a video showing McDowney yelling that he had killed someone.

Rhodes testified on his own behalf after the Commonwealth rested. According to Rhodes, several women invited him and McDowney to Brown's house. He drove there slowly because he was looking for the house number in the dark. He admitted he always carried the .45 caliber firearm concealed in his back waistband with a concealed carry permit. He testified that after he asked the Wallins who owned the house, James "screamed out, you fucking looking at

- 7 -

the people that live here, what do you need?" Rhodes asked why James was being so hostile, and James pulled out his gun, responding, "or else what, mother fucker?" Rhodes testified that because of his military background, a "basic fight or flight response" "kicked in" and he "closed the gap" with James, swiping James's gun away and pushing James against the wall with his forearm while pulling out his own weapon. He denied placing his gun against James's head and did not remember whether he fired his weapon. He testified that it was "a possibility that [James] was hit with [Rhodes's] weapon."

When Rhodes swiped down on James's gun, James shot Rhodes in the leg and pelvis. They struggled, and Rhodes threw James off the porch. Rhodes and James then wrestled in the yard. James kept firing, and Rhodes was hit seven times. While Rhodes was on top of James trying to disarm him, he heard a gunshot come from elsewhere, and James "[w]ent limp." Rhodes looked up to see McDowney and assumed that McDowney shot James. Rhodes and McDowney then drove to the hospital together. Rhodes testified that he lied to the police because he "was scared and . . . didn't really want to implicate the person that had possibly saved [his] life."

The jury convicted Rhodes of second-degree murder and first-degree felony murder. The trial court dismissed the second-degree murder charge as duplicative. The jury also convicted Rhodes of abduction, using a firearm in furtherance of abduction, making a false police report, brandishing a firearm, recklessly handling a firearm, trespassing, and assault and battery as a lesser-included offense of aggravated malicious wounding. The jury acquitted Rhodes of aggravated malicious wounding, using a firearm in the commission of aggravated malicious wounding, and a second trespass count. The trial court sentenced Rhodes to life imprisonment plus 13 years and 60 months, with 59 years suspended. Rhodes appeals.

ANALYSIS

I. Suppression Motion

Rhodes first argues that the trial court erred by denying his motion to suppress statements Rhodes made to Detective Horn. The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." "For purposes of a Fifth Amendment self-incrimination challenge, '[v]oluntariness is a question of law, subject to independent appellate review.'" *Secret v. Commonwealth*, 296 Va. 204, 225 (2018) (quoting *Avent v. Commonwealth*, 279 Va. 175, 195 (2010)). "Subsidiary factual questions, however, are entitled to a presumption of correctness" and will be upheld unless they "are plainly wrong or without evidence to support [them]." *Id.* (internal quotation marks omitted).

The privilege against self-incrimination extends to individuals subjected to custodial interrogation by the police. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). Before law enforcement officers may question a suspect who is in custody, the suspect

> must be warned . . . that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479.

The relevant inquiry to determine if a suspect is in custody is "how a reasonable person in the suspect's situation would have understood his circumstances." *Keepers v. Commonwealth*, 72 Va. App. 17, 34 (2020) (quoting *Alvarez Saucedo v. Commonwealth*, 71 Va. App. 31, 41 (2019)). Relevant factors include "whether the police used physical restraints, displayed their weapons, engaged in physical contact, or told the suspect he was free to leave," as well as the number of officers present and whether they formally arrested the suspect. *Id.*

Statements obtained during a custodial interrogation without *Miranda* warnings "generally will be subject to exclusion for most proof purposes in a criminal trial." *Anderson v. Commonwealth*, 279 Va. 85, 91 (2010) (quoting *Dixon v. Commonwealth*, 270 Va. 34, 39 (2005)). The prosecution may still use statements obtained in violation of *Miranda* to impeach a witness's credibility during cross-examination, however. *Harris v. New York*, 401 U.S. 222, 226 (1971) ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."). Here, the Commonwealth did not use any of Rhodes's statements to Detective Horn as part of its case in chief. Rather, it used those statements solely when cross-examining Rhodes to impeach his credibility. Accordingly, assuming without deciding that the trial court erred in concluding that Detective Horn was not obligated to provide *Miranda* warnings, such error was harmless.[5]

Apart from *Miranda*, the Commonwealth must still prove that Rhodes's statements were made voluntarily. "The test for determining voluntariness is whether the statement was the 'product of an essentially free and unconstrained choice by its maker.'" *Secret*, 296 Va. at 226 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). An involuntary statement is one which has been "induced by such duress or coercion that the suspect's 'will has been overborne and his capacity for self-determination critically impaired.'" *Id.* (quoting *United States v. Locklear*, 829 F.2d 1314, 1317 (1987)). "In determining whether a defendant's will was overborne by police coercion, courts look to the totality of all the surrounding circumstances,

---

[5] Our jurisprudence recognizes limits to the use of extrinsic evidence solely to impeach a witness's credibility. *See McGowan v. Commonwealth*, 274 Va. 689, 695 (2007) ("[T]he cross-examiner is bound by the answer given, and cannot introduce any extrinsic evidence to otherwise contradict the witness." (quoting *Allen v. Commonwealth*, 122 Va. 834, 841 (1918))). Aside from his arguments in favor of suppression, Rhodes does not challenge the Commonwealth's playing of recorded statements during its cross-examination of Rhodes.

including the defendant's background and experience and the conduct of the police." *Id.* (internal citations omitted).

Rhodes contends that Detective Horn overpowered his will on August 12.[6] We disagree. Although we are mindful of Rhodes's vulnerable physical position, there is no indication that Detective Horn sought to exploit that condition. *Cf. United States v. Cristobal*, 293 F.3d 134, 141 (4th Cir. 2002) ("The evidence here does not show that law enforcement officials exploited [the suspect]'s weakened condition with coercive tactics."). Rhodes was a sophisticated party who expressed familiarity with interrogation techniques from his time working in Army intelligence. He was coherent and answered some of Detective Horn's questions while declining to answer others. Indeed, his statements are inculpatory primarily because he *lied* to Detective Horn to *conceal his guilt*. It can hardly be said that Detective Horn coerced Rhodes into lying against his will.[7] Accordingly, we find no reversible error in the trial court's denial of Rhodes's suppression motion.

## II. Sufficiency of the Evidence

Rhodes next challenges the sufficiency of the evidence underlying his convictions for first-degree felony murder, abduction, and using a firearm in the commission of abduction. "On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460

---

[6] Consistent with his concession below, Rhodes challenges the admission of his August 13 and 14 statements solely on *Miranda* grounds.

[7] This case differs from *Mincey v. Arizona*, 437 U.S. 385 (1978), on which Rhodes relies. In *Mincey*, the police interviewed the defendant at the hospital while the defendant "was unable to talk because" of tubes that were inserted in his throat to help him breathe, requiring the defendant to write his answers on a piece of paper. *Id.* at 396. The defendant "asked repeatedly that the interrogation stop until he could get a lawyer," but police ignored his pleas. *Id.*

(2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"[D]etermining the credibility of witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify." *Maldonado v. Commonwealth*, 70 Va. App. 554, 562 (2019) (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "Thus, this Court must accept 'the trial court's determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible."'" *Canada v. Commonwealth*, 75 Va. App. 367, 386 (2022) (quoting *Nobrega v. Commonwealth*, 271 Va. 508, 518 (2006)). "[W]e may only disturb the trial court's credibility determination if the evidence is 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Lopez v. Commonwealth*, 73 Va. App. 70, 84 (2021) (quoting *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald*, 295 Va. at 487 (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

Code § 18.2-53.1 makes it unlawful to "use or attempt to use any . . . firearm . . . in a threatening manner while committing or attempting to commit . . . abduction." A person is guilty of abduction if, "by force, intimidation or deception, and without legal justification or excuse, [he] seizes, takes, transports, detains or secretes another person with the intent to deprive

such other person of his personal liberty." Code § 18.2-47(A). The crime of abduction therefore contains the *actus reus* of "taking, transporting, or detention of another" and the *mens rea* of having "a specific intent to deprive another of h[is] liberty." *Brown v. Commonwealth*, 74 Va. App. 721, 730-31 (2022) (citing *Walker v. Commonwealth*, 47 Va. App. 114, 120 (2005)). Statutory abduction requires no proof of asportation. *Lawlor v. Commonwealth*, 285 Va. 187, 224 (2013) (citing *Scott v. Commonwealth*, 228 Va. 519 (1984)). A reasonable fact finder could conclude that Rhodes intentionally deprived James of his liberty when Rhodes grabbed James's throat and pressed him against the storm door or when he was on top of James, pressing him facedown into the lawn.

Murder in the commission of abduction is first-degree murder. Code § 18.2-32. "[T]he malice intrinsic in the commission of [abduction] 'provides the malice prerequisite to a finding that the homicide was murder.'" *Flanders v. Commonwealth*, 298 Va. 345, 354-55 (2020) (quoting *Wooden v. Commonwealth*, 222 Va. 758, 762 (1981)). Under the *res gestae* rule, there must "be a connection between the predicate felony and the death." *Id.* at 359. In other words, the killing must be "so closely related to the felony in time, place, and causal connection as to make it a part of the same criminal enterprise." *Id.* (quoting *Haskell v. Commonwealth*, 218 Va. 1033, 1044 (1978)). "Whether these elements are proven in a particular case is a case-specific inquiry for the fact finder to decide." *Id.* at 360 (citing *Haskell*, 218 Va. at 1043).

Rhodes argues that "it cannot be said that this situation created an event of such duration and detachment from the other charges, so as to create a new charge of abduction." In *Brown v. Commonwealth*, 230 Va. 310 (1985), our Supreme Court held that a defendant may be convicted of abduction in addition to "another crime involving restraint of the victim, both growing out of a continuing course of conduct, . . . only when the detention committed in the act of abduction is separate and apart from, and not merely incidental to, the restraint employed in the commission

of the other crime." *Id.* at 314; *see also Swezey v. Commonwealth*, 77 Va. App. 809, 815-19 (2023). The question is "whether any detention exceeded the minimum necessary to complete the required elements of the other offense," such as rape. *Lawlor*, 285 Va. at 225 (citing *Powell v. Commonwealth*, 261 Va. 512, 541 (2001)). The Supreme Court has explained, however, that "murder is not a crime for which detention is inherent as an intrinsic element." *Id.* (citing *Powell*, 261 Va. at 541 n.11); *see also Pryor v. Commonwealth*, 48 Va. App. 1, 6 (2006) ("[A]n abduction preceding a murder can never be said to be legally 'inherent in the act' of murder." (citing *Brown*, 230 Va. at 314)). Rhodes's act of detaining James against the storm door was not necessary to accomplish the murder. Accordingly, Rhodes's argument that his abduction of James was merely incidental to the murder fails.[8] Indeed, Rhodes in essence admits that the *res gestae* rule is met. Because Rhodes's crime of abduction and James's death were closely connected in time, place, and cause, a reasonable fact finder could convict Rhodes of first-degree felony murder.

Rhodes also asserts that the "events that transpired can be viewed through the lens of the affirmative defense of self-defense." "Self-defense is an affirmative defense which the accused must prove by introducing sufficient evidence to raise a reasonable doubt about his guilt." *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022) (quoting *Hughes v. Commonwealth*, 39 Va. App. 448, 464 (2002)). "To be entitled to use potentially lethal force in self-defense, a defendant 'must reasonably fear death or serious bodily harm[.]'" *Id.* at 807 (alteration in

---

[8] Rhodes cites the factors established by this Court in *Hoyt v. Commonwealth*, 44 Va. App. 489, 496-97 (2004), for determining when an abduction is incidental to another offense. In *Lawlor*, the Supreme Court declined to apply the *Hoyt* factors in favor of applying "[its] own precedents." *Lawlor*, 285 Va. at 225-27 n.14. Although the Supreme Court "express[ed] no opinion on the *Hoyt* factors" with regard to crimes such as rape, it clearly explained that abduction could not be considered incidental to murder. *Id.* at 225, 227 n.14. Similarly, in *Pryor*, we declined to apply *Hoyt* to a defendant convicted of murder and abduction. *Pryor*, 48 Va. App. at 7 n.2. We have recently said that "the *Lawlor* test is mandatory and consideration of the *Hoyt* factors is permissive." *Swezey*, 77 Va. App. at 817.

original) (quoting *McGhee v. Commonwealth*, 219 Va. 560, 562 (1978)). "Whether the danger is reasonably apparent is judged from the viewpoint of the defendant at the time of the incident." *Id.* (quoting *Hines v. Commonwealth*, 292 Va. 674, 679 (2016)). "[A] 'defendant must . . . show that he was in *imminent* danger of harm, that is, a showing of an overt act or other circumstance that affords an *immediate* threat to safety.'" *Id.* (second alteration in original) (quoting *Hines*, 292 Va. at 679). "Whether an accused proves circumstances sufficient to create a reasonable doubt that he acted in self-defense is a question of fact." *Id.* (quoting *Bell v. Commonwealth*, 66 Va. App. 479, 486 (2016)). Accordingly, we will not disturb the jury's factual findings "unless plainly wrong or without evidence to support them." *Id.* (quoting *Smith v. Commonwealth*, 17 Va. App. 68, 71 (1993)).

As explained previously, on appeal we "discard the evidence of the accused in conflict with that of the Commonwealth." *Bagley*, 73 Va. App. at 26 (quoting *Cooper*, 54 Va. App. at 562). Applying that principle, a reasonable fact finder could reject Rhodes's self-defense claim. Alyssa and Hart each testified that James neither drew his firearm nor moved toward Rhodes before Rhodes grabbed James by the throat and pressed a gun to James's head. A jury could credit their testimony, disbelieve Rhodes's testimony that James pulled his firearm and pointed it at Rhodes, and reasonably conclude that Rhodes was the initial aggressor.

Accordingly, a reasonable fact finder could convict Rhodes of abduction and first-degree felony murder.[9] Sufficient evidence also supports Rhodes's conviction for using a firearm in furtherance of a felony.[10]

CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court. We remand for the limited purpose of correcting the clerical error in the sentencing order.

*Affirmed and remanded.*

---

[9] "[O]nly acts causing death which are committed by those involved in the felony can be the basis for a conviction." *King v. Commonwealth*, 6 Va. App. 351, 357 (1988). The Commonwealth argued during closing that McDowney shot James while Rhodes pinned James to the ground, though it is unclear who the jury believed delivered the killing blow. We do not reach such questions as whether McDowney can be said to have been "involved" in the abduction or whether the Commonwealth proved that Rhodes personally killed James, however, because Rhodes does not raise such issues on appeal.

[10] Rhodes's only challenge to this conviction rests on his challenge to his felony murder and abduction convictions.